**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
————————————————————————X
ABDON DE LA PENA,

                                                          **MEMORANDUM OF**
                                                          **DECISION AND ORDER**
                                                          12–CV–0766 (ADS)

                              Plaintiff,

              -against-

METROPOLITAN LIFE INSURANCE
COMPANY, SANG IM, and KATHY DEAS,

                              Defendants.
————————————————————————X
**APPEARANCES:**

**WOLIN & WOLIN**
*Attorneys for the Plaintiffs*
420 Jericho Turnpike, Suite 215
Jericho, NY 11753
          By: Alan E. Wolin, Esq., of Counsel

**MARGOLIS & TISMAN LLP**
*Attorneys for the Defendants*
280 Madison Avenue, Suite 500
New York, NY 10016
          By: Stephen E. Tisman, Esq., of Counsel

**SPATT, District Judge.**

          The Plaintiff Abdon De La Pena ("Plaintiff") commenced this employment

discrimination action against the Defendants Metropolitan Life Insurance Company

("Metropolitan" d/b/a and referred to herein as "Defendant MetLife"), as well as two individual

employees, Sang Im ("Defendant Im"), a Manager Director at MetLife, and Kathy Deas

("Defendant Deas"), an Operations Manager at MetLife.  In the Complaint, the Plaintiff asserts

claims pursuant to Title VII, 42 U.S.C. § 1981 *et seq.* ("Section 1981"), the Age Discrimination

in Employment Act of 1967 ("ADEA"), and the New York City Human Rights Law

("NYCHRL"). The Plaintiff alleges that the Defendants engaged in a discriminatory course of conduct against him based upon his age, race/color, and/or national origin. Also, the Plaintiff maintains that the Defendants created or subjected him to a hostile work environment because of his membership in a protected class. The Plaintiff further contends that his position of employment with MetLife ceased as a result of the Defendants' activities, constituting an actual or constructive discharge.

Presently before the Court is the Defendants' motion to dismiss, in which the Defendants seek dismissal of: (i) the fifth, sixth, and seventh claims for relief, on the ground that the Court lacks subject matter jurisdiction over these claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Rule 12(b)(1)"); and (ii) all other claims which are asserted in the Complaint based upon the Plaintiff's alleged failure to state a plausible claim for relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").

For the reasons set forth below, the Court grants the Defendants' motion to dismiss the Complaint in its entirety.

## I.    BACKGROUND

The following facts are viewed in the light most favorable to the Plaintiff. The Plaintiff is sixty years of age and is of Asian/Filipino descent. On or about June 13, 2005, he became employed by MetLife as a Financial Representative at a sales office located at 35–01 30th Avenue, Astoria, New York. In this position, the Plaintiff sold life insurance and other financial products to clients. He initially reported to Johnny Rahman, Managing Director of the Long Island City Financial Group. However, in or around August 2008, the Long Island City Financial Group merged with MetLife's Metropolitan Financial Group. At that time, Defendant Im, employed by MetLife as Manager Director of the Metropolitan Financial Group, became the

Plaintiff's supervisor. Defendant Im remained the Plaintiff's supervisor, to whom the Plaintiff was required to report, for the duration of his employment with MetLife.

Uka Gjonbalaj ("Gjonbalaj"), who is not named as a party in this matter, is referred to in the Plaintiff's complaint and in his opposition to the instant motion to dismiss. Gjonbalaj is employed by MetLife as a Sales Director, but according to the Plaintiff, also acted as the Plaintiff's immediate supervisor. (Pl.'s Mem. at 2.) However, it is unclear as to the extent to which the Plaintiff actually reported to Gjonbalaj, or alternatively, to Defendant Im. Furthermore, the parties do not dispute that Defendant Im was the supervisor to whom the Plaintiff reported to for the majority of his employment with MetLife. (Compl., ¶ 27, 29.)

With regard to the complained of actions and inaction, the Plaintiff maintains that during the course of his employment, MetLife, as well as its agents and employees, undertook an unlawful course of conduct by deliberately discriminating against him based upon his age, race/color, and/or national origin. The grounds underlying each discrimination claim are somewhat vague in the Complaint. However, this Court discerns the Plaintiff's complaint as asserting: (i) discrimination through a theory of disparate treatment; (ii) a hostile work environment; and (iii) constructive discharge. The Plaintiff alleges that the Defendants' actions were "pervasive, ongoing and adversely affected [his] job status and responsibilities, making it extremely difficult for him to carry out his day-to-day duties." (Pl.'s Mem. at 3.) The Defendants deny all the material allegations in the Complaint. Furthermore, the Defendants maintain that any action or inaction taken against the Plaintiff stemmed from his substandard productivity while employed by MetLife, and was unrelated to his age, race/color, and/or national origin.

Initially, in or about September 2008, De La Pena received a written warning advising him that his production on the job was below the standards MetLife expected of all of its employees. The letter informed him that he had been placed on an "Action Plan", under which MetLife would begin monitoring his performance of job–related activities. The Plaintiff denies that his productivity on the job was ever substandard. (Compl., ¶ 30, 36.)

A series of events then occurred between October 20, 2008 and October 27, 2008. First, by letter dated October 21, 2008, the Plaintiff was advised by Joseph Cameron of the Human Resources Service Center that his position of employment with Defendant MetLife was discontinued effective October 20, 2008. According to the Plaintiff, he did not receive the letter of termination until the following week, on or about October 27, 2008. The Plaintiff also asserts that the October 2008 termination was without cause, emphasizing that he had met and exceeded the goals and conditions laid out in the September 2008 letter of warning.

In the interim, between October 20, 2008 and the time when the Plaintiff allegedly received the October 2008 termination letter, the Plaintiff discovered a "List of Top Ten Writing Agents" on a bulletin board in the MetLife office in which he worked. (Compl., ¶ 47.) The Plaintiff's name was on the list with the word "terminated" printed adjacent to it. On this occasion, De La Pena immediately brought the matter to the attention of Gjonbalaj, who quickly corrected the instant problem by covering the word "terminated" with a piece of tape.

Also during the week of October 20, 2008, the Plaintiff claims that he was unable to access the computer system at MetLife. He alleges that his inability to log into the computer system was problematic for two reasons. First, the Plaintiff insists that as an employee of MetLife, the Defendants had a clear duty to ensure that he had and maintained computer access at all times, as necessary to carry out his business responsibilities. (Pl.'s Motion in Opp. at 3–4.)

Thus, the Plaintiff contends that in denying him access to the computer system, the Defendants deprived him of access to information required to transact business and process applications. (Id.) Second, the Plaintiff claims that sometime in the week of October 20, 2008, Gjonbalaj asked him to sign a "Compensation Plan Acknowledgement." (Compl., ¶ 40, 42.) This form should have been signed at the beginning of Plaintiff's employment, as it is the general protocol of MetLife with new employees. However, because the Plaintiff was unable to access MetLife's computer system at the time when he received the plan, he could not *personally* retrieve documents related to the plan. Nevertheless, the Plaintiff admits that Theresa Arcea ("Arcea"), a Team Manager at MetLife, printed and provided him with copies detailing the plan's terms and conditions. (Pl.'s Motion in Opp. at 4.) Despite reviewing the relevant documents, the Plaintiff contends that he did not fully comprehend the plan's terms and conditions, but was pressured into signing the acknowledgment on October 21, 2008. (Id.) The Defendants do not deny or explain why De La Pena could not access the computers for this alleged period of time. However, the Defendants refute that anyone at MetLife acted "deliberately and without justification" for the purpose of depriving the Plaintiff of access "by means of disabling [his computer] password." (Compl., ¶ 39.)

On October 27, 2008, after receiving the October 2008 termination letter, the Plaintiff and Gjonbalaj exchanged text messages regarding the end of the Plaintiff's employment. Gjonbalaj asked De La Pena to come in the following day to meet with Defendant Im. On October 28, 2008, the Plaintiff arrived at the office at 11:00 a.m. and waited until 2:00 p.m. for Defendant Im to arrive. (Id. at 51.) At the meeting, Plaintiff raised several complaints, such as: (i) how Defendant Im treated him disrespectfully; (ii) past delays experienced in processing client applications; and (iii) not receiving a bonus because of the alleged delays. (Id. at 51–53.)

The Plaintiff also argued that his October 2008 termination was not justified because he complied with the September 2008 warning letter. On or about November 3, 2008, the Plaintiff's employment was reinstated. The Plaintiff alleges that he was reinstated after the Defendants determined that he had met their expectations. (Id. at 55.)

De La Pena remained employed by MetLife until November 18, 2008, at which time he alleges he was actually or constructively discharged from his position. (Compl., ¶ 27, 29.) Specifically, on November 18, 2008, at a follow–up meeting after his reinstatement, De La Pena alleges that Defendant Im wrongfully accused him of arriving late. Thereafter, the Plaintiff asserts that Defendant Im struck him in the back with his right hand, which caused the Plaintiff to be pushed forward into a desk. The Plaintiff describes Defendant Im's behavior at the meeting as "cantankerous and threatening," and maintains that Defendant Im's conduct was unprovoked. (Id. at 56.) At that time, the Plaintiff contends that Defendant Im asked him to leave. Consequently, the Plaintiff turned in his laptop and computer files and did not return to MetLife. The Plaintiff interprets this incident as an actual or constructive discharge of his employment with MetLife.

Although not appropriately considered on a motion to dismiss, the Defendants deny the occurrence of the alleged discharge. According to the Defendants, the Plaintiff voluntarily abandoned his employment in November 2008 and was formally terminated effective March 4, 2009. (Tisman Decl. Ex. C at 2.) The Defendants have put forth continued communications between the Plaintiff and the Defendants after the Plaintiff's last day of work at MetLife in November 2008. Specifically, MetLife sent De La Pena written correspondence, which affirmed that the Plaintiff was still employed by MetLife, and directed the Plaintiff to return to work immediately in order to maintain his position. (Id.) Upon receipt of this correspondence, the

Plaintiff submitted a written response to Defendant MetLife, dated December 11, 2008, in which he "acknowledged his absence from work and stated he would not return unless the Managing Director (Defendant Im) was replaced." (Id.) Thereafter, on March 3, 2009, based upon the Plaintiff's confirmation that he did not intend ever to return to work, MetLife terminated his employment under circumstances, which it deemed "job abandonment." (Id.) However, none of these documents are properly before the Court in the context of a motion to dismiss. Generally a court does not look beyond the pleadings in deciding a motion to dismiss. Although one exception to this rule is where a plaintiff has knowledge or possession of material facts, which he purposefully left out of the complaint, "mere notice or possession is not enough"; "the Plaintiff [must] *rel[y]* on the terms and effect of [the] document in drafting the complaint". <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002). Here, while the Plaintiff presumably was in possession of these documents, he did not rely on the terms or effect of these documents when drafting the Complaint.

The Complaint does not clearly indicate the scope of the employment relationship, if any, maintained between Defendant Deas and the Plaintiff. De La Pena merely alleges that he complained to Defendant Deas, but that she did nothing to rectify or address the problems that he was experiencing. (Id. at 61.) The Plaintiff does not specify whether and in what regard he reported to Defendant Deas, nor does he assert that Defendant Deas had the authority to remediate the complained of incidents.

As a result of the foregoing, on July 17, 2009, the Plaintiff filed a Verified Complaint with the New York State Division of Human Rights ("NYSDHR") and a dual complaint with the Equal Employment Opportunity Commission ("EEOC") pursuant to Executive Law, Article 15. (Defs.' Motion Ex. B.) In each complaint, the Plaintiff alleged that the Defendants engaged in

unlawful employment practices, discriminating against him due to his age, race/color, and national origin.

On June 24, 2011, the NYSDHR dismissed the complaint, concluding upon investigation that there was no probable cause for the claims asserted. (Defs.' Motion Ex. C.) Among other reasons, the NYSDHR found that contrary to the Plaintiff's contentions, he was not terminated on November 18, 2008. Instead, based upon correspondence exchanged between the Plaintiff and MetLife, it found that De La Pena was advised to return to work, but refused to do so unless MetLife agreed to replace Defendant Im. (Id.) Under these circumstances, the NYSDHR concluded that the Plaintiff was not discharged, but rather his employment was terminated by abandonment. (Id.) Further grounds for dismissal were premised upon the following findings: (i) lack of evidence to establish that other employees were treated more favorably than the Plaintiff; (ii) no nexus between the adverse employment action and the Plaintiff's age, race/color, and/or national origin; (iii) failure to raise any prior complaints of alleged discrimination to MetLife, as necessary to maintain the claim asserted for "Opposed discrimination/Retaliation;" (iv) failure to substantiate the claim that Defendant Im had struck the Plaintiff; and (v) failure to refute the legitimate, non–discriminatory purpose raised by the Defendants to explain the actions and inaction taken against the Plaintiff. (Id.)

On September 27, 2011, the EEOC issued and mailed the Plaintiff a Dismissal and Notice of Rights, advising him that a Title VII or ADEA action related to the claims he had asserted needed to be brought within 90 days. However, the Plaintiff claims that he did not receive the Notice of Rights until November 23, 2011. On February 16, 2012, 142 days after issuance of the Notice of Rights, the Plaintiff commenced this action. Viewing the complaint in the light most favorable to the Plaintiff, the Court construes the complaint as asserting seven discrimination

claims.  However, because the Plaintiff has since withdrawn the three claims asserted pursuant to

NYCHRL (Pl.'s Motion in Opp. at 1–2), the Court will only discuss the four outstanding claims

in the instant action.

The Plaintiff first alleges that Defendant MetLife engaged in unlawful employment

practices, discriminating against him and subjecting him to a hostile work environment because

of his race/color.  Second, the Plaintiff asserts that the Defendant MetLife engaged in unlawful

employment practices, discriminating against him and subjecting him to a hostile work

environment because of his national origin.  Both of these claims are brought against Defendant

MetLife pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000–e

*et seq.* ("Title VII").

Next, the Plaintiff contends that Defendant MetLife violated the Age Discrimination in

Employment Act, 29 U.S.C. § 621 *et seq.*, as amended ("ADEA").  In this regard, the Plaintiff

alleges that Defendant MetLife discriminated against him on account of his age, denying him of

fair and equal opportunities that include, *inter alia*, the same compensation, terms, conditions,

and privileges received by other employees.  In addition, the Plaintiff maintains that Defendant

MetLife subjected him to a hostile work environment because of his age.

Finally, as the fourth cause of action against all named defendants, the Plaintiff maintains

that the Defendants violated 42 U.S.C. § 1981, discriminating against him by subjecting him to

disparate treatment based upon his race/color.

Presently before the Court is the Defendants' motion to dismiss pursuant to Rule 12(b)(1)

and Rule 12(b)(6).  In response to this motion, the Plaintiff has withdrawn the fifth, sixth, and

seventh claims in this matter for which the Defendants brought this motion under Rule 12(b)(1).

Therefore, the Court need only address the motion to dismiss pursuant to Rule 12(b)(6).  In this

regard, the Defendants contend that certain claims under Title VII and the ADEA must be dismissed because they are untimely, occurring more than 300 days before the Plaintiff filed his complaint. The Defendants assert an additional ground for dismissal of the Title VII, the ADEA, and the Section 1981 claims, arguing that the Plaintiff has failed to allege facts sufficient to state a claim for relief for discrimination or a hostile work environment. Further, the Defendants maintain that individual liability cannot attach pursuant to 42 U.S.C. § 1981, and thus, all of those claims brought against Defendant Im and Defendant Deas must be dismissed. Finally, the Defendants contend that certain damages being claimed by De La Pena, specifically, seeking recovery for alleged physical and emotional injury, damage to reputation, and punitive damages, are not available under the ADEA.

## II.    DISCUSSION

### A.    Legal Standard On a Motion to Dismiss Pursuant to Rule 12(b)(6)

Under the well-established Twombly standard, a court should dismiss a complaint only when it lacks sufficient factual allegations so as to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). The Second Circuit has defined the plausibility standard "[a]s guided by '[t]wo working principles." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Id. (quoting Iqbal, 556 U.S. at 678). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

Where a complaint is comprised of "well–pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. Thus, in considering the within motion to dismiss, this Court accepts as true any and all factual allegations set forth in the complaint and draws all reasonable inferences in the Plaintiff's favor. See Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990) (noting that "[f]or purposes of review of a Rule 12(b)(6) dismissal, the factual allegations of [plaintiff's] complaint are taken as true"); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007) (observing that on "a motion to dismiss, [the Court] must take the facts alleged in the complaint as true, drawing all reasonable inferences in the Plaintiffs' favor").

Only if this Court finds that "the complaint cannot state any set of facts that would entitle the plaintiff to relief" will it grant dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993). Consequently, the pertinent issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

While the Second Circuit has yet to clarify the precise pleading standard with regard to discrimination cases, the United States Supreme Court has established that "[t]he *prima facie* case [set forth] under McDonnell Douglas [as to the elements, order, and allocation of proof] is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002) (observing that "[t]his Court has never

indicated that the requirements for establishing a *prima facie* case under <u>McDonnell Douglas</u> also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss") (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The extent to which the "well-settled <u>Swierkiewicz</u> standard" can coexist within the <u>Iqbal</u>-<u>Twombly</u> framework is not fully resolved; nevertheless, "the Second Circuit has reiterated that <u>Swierkiewicz</u> continues to be the proper framework for analyzing whether a plausible claim for discrimination has been stated." <u>Hemans v. Long Island Jewish Med. Ctr.</u>, No. 10 Civ. 1158, 2010 WL 4386692, at *1, *6 (E.D.N.Y. Oct. 28, 2010); <u>see also</u> <u>Gillman v. Inner City Broad Corp.</u>, No. 08 Civ. 8909, 2009 WL 3003211, at *1, *3 (S.D.N.Y. Sept. 18, 2009) (stating that "<u>Iqbal</u> was not meant to displace <u>Swierkiewicz</u>'s teachings about pleading standards for employment discrimination claims because in <u>Twombly</u>, which heavily informed <u>Iqbal</u>, the Supreme Court explicitly affirmed the vitality of <u>Swierkiewicz</u>").

B.      <u>As to the Statute of Limitations</u>

As an initial matter, the Defendants raise an issue with respect to the timeliness of the Plaintiff's Title VII and ADEA claims on the ground that prior to commencement of this action, the statute of limitations expired, barring relief based on acts occurring prior to September 20, 2008.

In New York State, a plaintiff must file any and all claims under Title VII or the ADEA with the EEOC within 300 days of the discriminatory act or practice. <u>See, e.g.</u>, <u>Patker v. New York City Dep't of Educ.</u>, No. 08 Civ. 7673, 2010 U.S. Dist. LEXIS 30388, at *1, *19–20 (S.D.N.Y. March 22, 2010) (dismissing with prejudice "Title VII and ADEA claims based upon discrete acts of discrimination or retaliation" on the ground that these claims were not filed timely).

The Plaintiff filed the Complaint in this matter with the EEOC on July 17, 2009. (Compl., ¶ 7, 8.) Thus, the Defendants argue that the Plaintiff's allegations with regard to the written warning memorandum dated September 17, 2008 (Compl., ¶ 25) and the complaint of alleged delays caused by the Defendants in processing the Plaintiff's client applications (Compl., ¶ 52–54) are untimely, as each of these events occurred prior to September 20, 2008. In turn, the Plaintiff seeks to circumvent the filing deadline, urging this Court to consider the "continuing violation" exception. Under this exclusion, the statute of limitations period is effectively tolled until the last discriminatory act took place. Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997).

The Second Circuit has established that the timely filing of an EEOC charge, which refers to "a particular discriminatory act committed in furtherance of an ongoing policy of discrimination, extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." Id. Nevertheless, the Second Circuit has further clarified that "[d]iscrete incidents of discrimination that are unrelated to an identifiable policy or practice, on the other hand, 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.' " Id. (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996)). Put another way, the continuing violation doctrine applies only where there is a specific "policy or mechanism" of discrimination at issue and "multiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." See Hongyan Lu v. Chase Inv. Services Corp., 412 Fed. App'x. 413, 416, (2d Cir. 2011) (citing Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)) (emphasis in

original).  "As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor."  Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000); accord Bernstein v. MONY Group, Inc., 228 F. Supp. 2d 415, 418 (S.D.N.Y. 2002).  As a result, "only 'compelling circumstances will warrant application of the exception to the statute of limitations.'"  Quadrozzi Concrete Corp. v. City of N.Y., No. 03 Civ. 1905, 2004 WL 2222164, at *8 (S.D.N.Y. 2004) (quoting McMillan v. City of N.Y., No. 95 Civ. 5459, 1997 WL 589019, at *3 (S.D.N.Y. Sept. 19, 1997), aff'd, 152 F.3d 919 (2d Cir.1998)).

Here, the Plaintiff has not sufficiently alleged a continued course of discriminatory conduct that, if proven, could constitute a policy or mechanism of race/national origin or age discrimination sufficient to toll the statute of limitations.  The Plaintiff merely alleges that he was sixty years of age and the only Filipino in the office, and then alleges a series of incidents that appear unrelated and do not evidence any discriminatory policy or mechanism.  Therefore, the Court finds that the Plaintiff has not sufficiently alleged a continuing pattern, so that his time-barred claims are not tolled by the continuing violation doctrine.  Accordingly, the Court grants the Defendants' motion to dismiss based on the statute of limitations and the Court will not consider either the written warning memorandum dated September 17, 2008 or the alleged delays caused by the Defendants in processing the Plaintiff's client applications.

C.    **As to Whether the Plaintiff Has Stated a Discrimination Claim**

Requiring a plaintiff to make a "*prima facie* case serves an important function in [employment discrimination] litigation: it eliminates the most common nondiscriminatory reasons" for what is allegedly disparate treatment or unlawful employment practices.  Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).  To establish a *prima facie* case for employment discrimination, the plaintiff must

present evidence to "raise[] as inference of discrimination . . . [such that the court can] presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Const. Corp. v. Waters, 428 U.S. 567, 577, 98 S. Ct. 2943, 2949–50, 57 L. Ed. 2d 957 (1978). A court will scrutinize the employer's conduct, policy, and practices in order to determine whether a plaintiff has successfully met his or her burden. See id.

Summarily, the Plaintiff accuses the Defendants of engaging in unlawful employment practices, and discriminating against him because of his race/color, national origin, and age. The Plaintiff contends that Defendants "treated [him] differently from other employees" on account of his race/color, national origin, and age. (Compl., ¶ 64, 72, 80.) The Plaintiff further alleges that he was actually or constructively discharged from his employment at MetLife. (Compl., ¶ 59.) In this regard, the Plaintiff maintains that "[t]he actions of defendants and their agents . . . were undertaken with the intent to ultimately ensure the cessation of [his] employment with MetLife." (Compl., ¶ 60.) The Court interprets the Complaint as asserting disparate treatment claims pursuant to Title VII, Section 1981, and the ADEA. As a claim of age discrimination is assessed under a different analysis, the Court will first address those claims concerning Plaintiff's race/color and national origin.

The Plaintiff has asserted Title VII claims against Defendant MetLife, alleging that he was discriminated against based on his protected status, specifically, his: (i) race/color, and/or (ii) national origin. Likewise, the Plaintiff has brought disparate treatment claims under Section 1981 against Defendant MetLife, and against Defendant Im and Defendant Deas in their official capacity as MetLife employees. In response, The Defendants argue that the Plaintiff has failed to state a claim under either Title VII or Section 1981 because the Complaint does not allege with the requisite specificity that he was singled out or otherwise treated differently *because of*

his race/color, or alternatively, his national origin. According to the Defendants, the Plaintiff's allegations of misconduct amount to little more than complaints of workplace inefficiency and discourteous treatment.

**1. As to the Title VII and Section 1981 Discrimination Claims**

Title VII prohibits discrimination based on race, color, religion, sex or national origin "with respect to . . . compensation, terms, conditions, or privileges of employment," and discriminatory practices that would "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 62 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Under Title VII, "[t]he term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). The Court observes that there is no question that Defendant MetLife falls squarely within the statutory definition of an employer for the purposes of a Title VII employment discrimination claim. Notably, the Second Circuit has explained that Title VII allows liability to attach only to the employer-entity, as "individuals are not subject to [personal] liability under Title VII." Wrighten v. Glowski, 232 F.3d 119 (2d Cir. 2000); see also Copeland v. Rosen, 38 F. Supp. 2d 298, 302 (S.D.N.Y. 1999) ("Individual employees may not be held personally liable under Title VII, even if they are supervisory personnel with the power to hire and fire other employees."). This limitation is not an issue because the Plaintiff has asserted Title VII claims against only Defendant MetLife.

"The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered [] stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S. Ct. 1817, 1823, 36 L. Ed. 2d 668

(1973) holding modified by Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). Title VII does not require employers to hire minority workers, but rather, prohibits employers from acting upon a "[d]iscriminatory preference for any group." Id. (seeking to achieve "trustworthy workmanship assured through fair and [] neutral employment and personnel decisions").

The Plaintiff also asserts causes of action pursuant to 42 U.S.C. § 1981, urging this Court to reasonably infer "[b]y reason of the actions and inactions of defendants . . . [that defendants] have engaged in unlawful discriminatory practices based upon his race/color." (Compl., ¶ 88.) Again, as previously stated, this Court presumes from the vague language of the Complaint that the Plaintiff is claiming that the Defendants treated him differently from other employees because of his protected status as a racial minority. In doing so, the Plaintiff argues that the Defendants violated his rights, as guaranteed under Section 1981.

In analyzing such a disparate treatment claim pursuant to Section 1981, the Court applies the same standards that are used to evaluate a Title VII discrimination claim. See, e.g., Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010); see also Staff v. Pall Corp., 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002) (observing that "[b]oth the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically"). Therefore, the standard which is set forth above and further explored below applies to both the Plaintiff's Title VII and Section 1981 claims.

The major distinction between claims brought under Section 1981 and Title VII is that Section 1981 provides for individual liability on the part of non-employers. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (holding that individuals may be held liable under Section 1981). Although the Second Circuit has not expressly established that

an individual must hold a supervisory position in order to be subject to Section 1981 liability, in Callahan v. Consolidated Edison Co. of New York, 187 F. Supp. 2d 132, 137 (S.D.N.Y. 2002), the court has observed that "[i]n each of the cases that have allowed individual liability, the individuals have been supervisors who were personally involved in the discriminatory conduct." Hicks v. IBM, 44 F.Supp.2d 593, 597 (S.D.N.Y. 1999); see also Ayton v. Lenox Hill Hosp., No. 93 Civ. 6601, 1997 WL 10000, at *1, *8 (S.D.N.Y. Jan. 10, 1997); Amin v. Quad/Graphics, Inc., 929 F. Supp. 73, 78 (N.D.N.Y. 1996).

There are three critical elements to make a *prima facie* case for discrimination under Title VII or Section 1981. A plaintiff must maintain a protected status, have suffered an adverse employment action, and the adverse action must have "occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." See, e.g., La Grande v. DeCrescente Distributing Co., Inc., 370 Fed. App'x 206, 211 (2d Cir. 2010). However, "[a]t the pleading stage, a plaintiff need not establish a *prima facie* case satisfying the required elements of disparate treatment, but only [plead] sufficient facts 'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. (quoting Boykin v. KeyCorp, 521 F.3d 201, 214 (2d Cir. 2008).

While a plaintiff need not elicit each and every element in the complaint, a plaintiff must provide "specific factual allegations as to events leading up to an adverse action." Morales v. Long Island Rail Road Co., No. 09 Civ. 8714, 2010 WL 1948606, at *1, *3 (S.D.N.Y. May 14, 2010). As the Second Circuit has stated, "wholly conclusory [allegations] are not sufficient to defeat a Fed. R. Civ. P. 12(b)(6) motion to dismiss." Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (citing Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990); see also Rivera–Powell v. New York City Bd. of Elections, 470 F.3d 458, 470 (2d Cir. 2006) (finding the "complaint

proffer[ed] only a conclusory allegation of discrimination, which, without evidentiary support or allegations of particularized incidents, [did] not state a valid claim and so cannot withstand a motion to dismiss." (internal citations and quotations omitted)); <u>Lopez v. Bay Shore Union Free Sch. Dist.</u>, 668 F. Supp. 2d 406, 414 (E.D.N.Y. 2009) (holding that "this Circuit continues to require that racial animus be plead with particularity.").

Thus, while the Court in <u>Swierkiewicz</u> undoubtedly eased the burden on a plaintiff in pleading a claim of employment discrimination, the precedent established is not interpreted to "relieve a plaintiff of the obligation to identify in his pleadings a specific employment practice that is the cause of the disparate impact." <u>Malone v. New York Pressman's Union No. 2</u>, No. 07 Civ. 9583, 2011 WL 2150551, at *1, *6 (S.D.N.Y. May 31, 2011) (quoting <u>Kulkarni v. City Univ. of New York</u>, No. 01 Civ. 10628, 2002 WL 1315596, at *1, *2 (S.D.N.Y. Jun. 14, 2002) (noting that the court dismissed plaintiff's Title VII disparate impact because the complaint failed to "sufficiently identify a specific discriminatory employment practice"). Rather, in order to survive a motion to dismiss, "[a] plaintiff must allege [at a minimum] those facts necessary to a finding of liability . . . [and] a plaintiff's allegations, accepted as true, must be sufficient to establish liability." <u>Id.</u> (quoting <u>Amron v. Morgan Stanley Inv. Advisors, Inc.</u>, 464 F.3d 338, 343–44 (2d Cir. 2006)). The Court will proceed to assess whether the Plaintiff has succeeded in stating a claim.

### a. The Plaintiff's Protected Status

Pursuant to the Title VII claim, the Plaintiff's protected status is his race/color and/or his national origin, whereas the Section 1981 claim is limited to the Plaintiff's race. The Defendants do not contest the fact that Plaintiff is a member of a protected class, and therefore, the Court

need not inquire further in this regard.  The Court finds that the Plaintiff has adequately plead membership in each of these protected groups.

### b.  The Defendants' Alleged Adverse Employment Actions

With regard to the next prong—the alleged adverse employment actions—it is important to note that "[t]he term 'adverse employment action' is not defined in Title VII."  Islamic Soc'y of Fire Dept. Pers. v. City of New York, 205 F. Supp. 2d 75, 82–83 (E.D.N.Y. 2002).  Hence, "the question of what constitutes an adverse employment action has received significant attention from the federal courts, which have not reached a consensus on the issue."  Id.; see Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000) (noting that the court considered different approaches in its analysis).  There are "some courts, such as the Fifth and Eighth Circuits, [which] have held that an 'adverse employment action' relates only to 'ultimate employment actions,' such as hiring, firing, promotions and demotions."  Islamic Soc'y, 205 F. Supp. 2d at 82–83; see Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997); Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997).  Meanwhile, other circuits such as "the First, Ninth, Tenth, Eleventh and D.C. Circuits, [have taken] an 'expansive view' of what may be considered an adverse employment action."  Islamic Soc'y, 205 F. Supp. 2d at 82–83.

Following a "middle-of-the-road" approach, the Second Circuit construes an adverse employment action as circumstances that cause a "materially adverse change in the *terms and conditions* of employment."  Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997) (emphasis added); see also Islamic Soc'y, 205 F. Supp. 2d at 83; McKenney v. New York City Off-Track Betting Corp., 903 F. Supp. 619, 623 (S.D.N.Y. 1995) (noting that district courts in New York State have expressly followed this rule).  Therefore, while a "'materially adverse' [] change in working conditions must be 'more disruptive than a mere convenience or an alteration of job

responsibilities", (Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

(quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)), what

ultimately constitutes an adverse employment action is assessed on a case-by-case basis.  See

Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).  In turn, the Second

Circuit has recognized factors that might constitute a materially adverse change, including, but

not limited to "a termination of employment, a demotion evidenced by a decrease in wage or

salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation."  Galabya, 202 F.3d at 640

(quoting Crady, 993 F.2d at 136).

      The Plaintiff alleges that Defendant MetLife subjected him to disparate treatment,

including, *inter alia*, depriving him of computer access, denying him of a bonus, falsely accusing

him of substandard work performance, and failing to present him with the company's

"Compensation Plan Acknowledgement" at the beginning of his employment, as presented to

other employees.  In addition, the Plaintiff contends that without legitimate cause, he was

actually or constructively discharged from his employment on the basis of his race/color and/or

national origin.  Although the Defendants' denials are ultimately not relevant in the context of a

motion to dismiss, the Defendants neither explain why, nor deny that the Plaintiff was in fact

denied computer access, and was not offered a bonus.  In addition, the Defendants do not refute

that the compensation plan should have been given to the Plaintiff at the beginning of his

employment.  However, as to the circumstances preceding the cessation of the Plaintiff's

employment, the Defendants do dispute that it constituted an actual or constructive discharge.

Likewise, the Defendants contend that no false accusations were made against the Plaintiff, but

rather, his work performance was below the expectations to which all MetLife employees are held.

In the Court's view, the Plaintiff's inability to access or use the MetLife computer system for a given period of time may have the indicia of an adverse employment action. See Gelin v. Geithner, No. 06 Civ. 10176, 2009 WL 804144, at *14 (S.D.N.Y. March 26, 2009) ("The disruption to Plaintiff's remote access from October through November 2005 also arguably qualifies as an adverse employment action, as it continued even after Plaintiff's suspension had ended, thereby interfering with Plaintiff's ability to access the IRS computer system while at home or working in the field."); see also Terry v. Ashcroft, 336 F.3d 128, 145 (2d Cir. 2003) (holding that suspension of use of government-owned vehicle was materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work.").

On the other hand, with regard to the claim that the Defendants deprived the Plaintiff of a bonus, even when construing the facts in the light most favorable to the Plaintiff, this claim is not one which amounts to adverse employment action. As it has been established that "[t]he elimination of speculative, potential future opportunities is insufficient to establish an adverse employment action." Malone, 2011 WL 2150551 at *7. Finally, the Plaintiff's discharge from employment—whether actual or constructive—may be considered an adverse employment action. See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996) ("One of the elements of a *prima facie* case of discriminatory discharge, as one might expect, is that the employee was discharged . . .This element may be satisfied by a showing of an actual or a constructive discharge."). Thus, the Complaint has adequately pled several instances of potential adverse employment actions.

### c. Casual Relation Between the Protected Status and Adverse Actions

Now that the Court has found that the Plaintiff has satisfied the first two elements for stating a Title VII or Section 1981 discrimination cause of action, the Court proceeds to analyze the crux of the present motion—whether the Complaint alleges a causal relation between the Plaintiff's protected status and the alleged adverse employment actions. As set forth above, there are differing views as to the precise degree of particularity a plaintiff must plead employment discrimination in order to survive a motion to dismiss. For instance, in Phillip v. University of Rochester, 316 F.3d 291, 298 (2d Cir. 2003), the Second Circuit vacated the trial court's ruling to dismiss the complaint, finding the complaint sufficient on its face. The Court concluded that although the complaint "[did] not contain many evidentiary allegations relevant to intent, it [did] allege that the plaintiffs were singled out of a group that apparently also contained non-minority students," which was adequate to state a cause of action. Id.

Likewise, where a plaintiff simply alleged his protected status, "identified the adverse employment action underlying his claim, *i.e.*, his termination, and [] stated that he was treated differently from other white and/or Hispanic employees due to his race," the court found these general allegations enough to state a plausible claim upon which relief could be granted. Smalls v. PetSmart, Inc., No. 09 Civ. 5347, 2010 WL 5572073, at *1, *4 (E.D.N.Y. Nov. 1, 2010), report and recommendation adopted by Smalls v. Petsmart, Inc., No. 09 Civ. 5347, 2011 WL 96576, at *1 (E.D.N.Y. Jan. 10, 2011). In Smalls, the plaintiff did not specifically allege that he was treated differently than "other employees [who] were 'similarly situated.'" Id. (emphasis added). Nevertheless, because the complaint "identified those employees and thus [] provided [the defendant] with adequate notice of his claim, the court ruled in the plaintiff's favor, denying

23

the motion to dismiss.  Id.; see also Peterson v. Long Island R.R. Co., No. 10 Civ. 480, 2010 WL 2671717, at *1, *4 (E.D.N.Y. June 30, 2010) (recognizing that the court held dismissal was *not* required despite the fact that plaintiff did not plead any allegations related to "comparators"). However, it is uncontested that the allegations which are pled must still "raise a right to relief above the speculative level."  Twombly, 127 S. Ct. at 1965.  Applying a more stringent interpretation of the pleading standard set forth in Twombly, a district court granted a motion to dismiss where the complaint "summarily label[ed] actions [as] . . . discriminatory [but] fail[ed] to connect [the alleged discrimination] to any concrete adverse employment action." Malone, 2011 WL 2150551 at *7.

In the instant matter, the only facts in the complaint which even relate to Plaintiff's protected status are that (i) he "was the only Filipino employed in his office" and (ii) "[n]either individual defendant is Filipino."  (Compl., ¶ 62.)  As stated above, this is sufficient to show his protected status.  In addition, the Plaintiff has alleged specific instances that the Defendants allegedly took adverse actions against him.  However, with regard to whether the Plaintiff adequately put the Defendants on notice of the disparate treatment claims in the Complaint, the Court observes that there exists a the fine line between "general allegations" and "summarily labeled actions", with the latter being insufficient to state a claim.  Although the Plaintiff was not required to compare how he, as opposed to other similarly situated employees, were treated, this Court is not persuaded that the Plaintiff has stated a plausible cause of action to which liability can be inferred.

For instance, the disparate treatment claim in Smalls, which was held sufficient to survive a motion to dismiss, was plead with far more particularity than the claims presently before this Court.  In Peterson, the court noted that the plaintiff did not specifically plead "comparators."

2010 WL 2671717, at *4. However, there were allegations that his employer had : (i) referred to the plaintiff as "you people", and (ii) subjected "white employees" (generally speaking, not individually identified) "to less severe punishment [than the plaintiff] for substantially similar conduct" Id. This allowed the court to make a comparison from which it could infer that the disparate treatment was based on the plaintiff's protected status.

On the other hand, the Plaintiff's disparate treatment claims in the present case are not pleaded with the requisite particularity to give rise to a plausible cause of action. The Plaintiff merely states that he was the only Filipino in his office and does not make a single allegation connecting this status to any behavior of the Defendants. The Plaintiff's claims do not give rise to an inference of discriminatory intent because there are no allegations from which such an inference can be made. Consequently, based upon the above, the Plaintiff's discrimination claims under Title VII against Defendant MetLife, as well as under Section 1981 against all named Defendants, are hereby dismissed without prejudice.

## 2. As to the ADEA Claim of Employment Discrimination

The Plaintiff also contends that Defendant MetLife discriminated against him on the basis of his age in violation of the ADEA. He asserts that "[b]y their actions, defendants have treated [him] differently from other employees on account of his age and discriminated against him in compensation, terms, conditions, and privileges of employment." (Compl., ¶ 80.)

The United States Supreme Court has clarified that a "disparate treatment theory is of course available under the ADEA." Hazen Paper Co, 507 U.S. at 609, 113 S. Ct. at 1706. The express language of the ADEA establishes that it is:

> unlawful for an employer . . . to discriminate against any individual . . . because of such individual's age [or to otherwise] limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment

opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a)(1), (2). "Congress promulgated the ADEA to address the concern that older workers are subject to employment disadvantages due to negative stereotypes about their ability to work." Miller v. Nat'l Ass'n of Sec. Dealers, Inc., 703 F. Supp. 2d 230, 243 (E.D.N.Y. 2010). However, the ADEA does not prohibit an employer from taking adverse employment action against an employee where the basis for doing so is reasonable. See, e.g., Hazen Paper Co, 507 U.S. at 609–10, 113 S. Ct. at 1706. Consequently, an employer might avoid liability under the ADEA by showing that, "even if . . . correlated with age: for example, retirement eligibility and pension status" was the actual reason for taking the alleged adverse action. Miller, 703 F. Supp. 2d at 243; see 29 U.S.C. § 623(f)(1) (defining "differentiation [] based on reasonable factors other than age" as a lawful employment practice); see also Hazen Paper Co, 507 U.S. at 609–10, 113 S. Ct. at 1706 (explaining that "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears") (emphasis omitted).

To succeed in making a *prima facie* age discrimination case pursuant to the ADEA, a plaintiff must (1) be "within the protected age group," (2) be "qualified for the position," (3) have "experienced adverse employment action," and (4) have suffered such action "under circumstances giving rise to an inference of discrimination." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).

ADEA claims were once analyzed under the same burden-shifting standard as Title VII and Section 1981 claims. See generally McDonnell Douglas Corp., 411 U.S. 792, 93 S. Ct. 1817

(stating that a plaintiff bears the initial burden to make a *prima facie* case, which upon doing so, shifts the burden to the defendant to provide a "legitimate, nondiscriminatory reason" for the action taken, thereafter shifting the burden back to the plaintiff, who ultimately bears the burden of persuasion). Indeed, a finding that the adverse employment action "was motivated at least in part by age discrimination" was once sufficient to sustain an ADEA claim. Tomassi v. Inginia Financial Group, Inc., 478 F.3d 111, 114 (2d Cir. 2009). However, the United States Supreme Court has since rejected this mixed-motive analysis. See Gross v. FBL Financial Services, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); cf. Visser v. Packer Engineering Associates, Inc., 924 F.2d 655, 661 (7 Cir. 1991) (en banc) (Flaum, J., dissenting) (noting that "[t]he difficulty judges have in formulating [burden-shifting] instructions and jurors have in applying them can be seen in the fact that jury verdicts in ADEA cases are supplanted by judgments notwithstanding the verdict or reversed on appeal more frequently than jury verdicts generally").

In Gross, the Court established that in order to succeed in "a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." 557 U.S. at 176, 129 S. Ct. at 2350; see 1 Webster's Third New International Dictionary 194 (1996); 1 Oxford English Dictionary 746 (1933); The Random House Dictionary of the English Language 132 (1966) (defining "because of"—the words which are used in 29 U.S.C. § 623—to mean "by reason" or "on account"); see also Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 63–64 & n. 14, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) (recognizing that "[i]n common talk, 'based on' [which has the same meaning as 'because of'] indicates a but-for causal relationship and thus a necessary logical condition"). Therefore, given "the ordinary meaning" of the requirements as laid out in the statute, the Court directed that age

must be "the 'reason' the employer decided to act" and age as a motivating factor will no longer suffice.  <u>Gross</u>, 557 U.S. at 174–76, 129 S. Ct. at 2349–50.

Although it is clear that an ADEA discrimination claim carries a more onerous burden than claims under Title VII or Section 1981, there remains some ambiguity regarding the extent to which the <u>McDonnell Douglas</u> burden-shifting analysis remains "appropriate in the ADEA context." <u>Gross</u>, 557 U.S. at 174, 129 S. Ct. at 2349, n.2 (observing that "the Court has not definitively decided" whether [and to what degree courts should rely on the <u>McDonnell Douglas</u>] evidentiary framework").  Nevertheless, the Court in <u>Gross</u> held that "[t]he burden of persuasion [no longer] shift[s] to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor." 557 U.S. at 180, 129 S. Ct. at 2352.

Here, the Plaintiff has neither stated, nor implied by the facts asserted, that his age was the *but for* cause of the Defendants treating him differently than other similarly situated employees at MetLife.  In fact, absent from the Complaint are any allegations suggestive that Defendants acted discriminatorily based on the Plaintiff's age.  The Defendants assert and correctly observe that the only fact contained in the Complaint suggestive of or otherwise related to unlawful age discrimination is De La Pena's stated age.  In particular, the only statements concerning the Plaintiff's age are that: (i) "Plaintiff was born on July 31, 1951" and (ii) "He is currently sixty (60) years of age." (Compl., ¶ 23.)  These allegations, on their own, are insufficient for the Plaintiff's ADEA claim to survive Defendants' 12(b)(6) motion to dismiss.  As stated by another district court in this circuit, which is equally applicable here:

> In the instant case, plaintiff has failed to plead, let alone establish a *prima facie* case of discrimination because there are no circumstances alleged in his Complaint that can fairly be characterized as giving rise to an inference of age discrimination.  There were no allegations by plaintiff that any member of the

District made any discriminatory comments relating to his age. In addition, the Complaint does not allege that any member of the District engaged in any overt discriminatory conduct toward the plaintiff concerning plaintiff's age. Indeed, plaintiff's claims do not give rise to an inference of discriminatory intent because there are no allegations from which such an inference can be made. . . . Accordingly, the allegations in the Complaint do not give rise to an inference of age discrimination.

Avgerinos v. Palmyra-Macedon Cent. Sch. Dist., 690 F. Supp. 2d 115, 130 (W.D.N.Y. 2010).

Therefore, this Court dismisses Plaintiff's ADEA claim against the Defendants without prejudice.

**D.**     **As to Whether the Plaintiff Has Stated a Claim for Hostile Work Environment**

Now that the Court has assessed the Plaintiff's employment discrimination claims under a disparate treatment theory, the Court shall proceed to determine whether the Plaintiff's causes of action under Title VII, Section 1981, or the ADEA, pursuant to a hostile work environment theory are sufficient to survive a motion to dismiss.

The Plaintiff contends that "[t]he acts discussed in the complaint, together with [his] assertions that the actions were improperly motivated, [is] sufficient to withstand" the motion to dismiss presently before this Court. (Pl.'s Motion in Opp. at 12.) To the contrary, the Defendants put forth two reasons showing that the Plaintiff has not pled a claim for relief based on a hostile work environment theory. First, despite accepting the facts in the Complaint as true, the Defendants assert that these general allegations fail to satisfy the "severe or pervasive" standard, which is used to assess a hostile work environment claim. (Defs.' Motion at 19.) Second, the Defendants maintain that even if the Plaintiff has shown the creation or existence of a hostile work environment, the Plaintiff has pled no facts to establish—express or impliedly— that the alleged "hostility" resulted from the Plaintiff's protected status, being either his race/color, age, or national origin. (Id.)

## 1. Presence of a Hostile Work Environment

The standard used to demonstrate a hostile work environment is essentially the same for claims brought under Title VII, Section 1981 and the ADEA. Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451–52 (E.D.N.Y. 2011); see Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006); Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). In general, to succeed on a hostile work environment claim, a plaintiff must demonstrate that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive [enough] to alter the conditions of the victim's employment'" claim. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)). Furthermore, according to the Second Circuit, "[p]roving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Feingold v. New York, 366 F. 3d 138, 150 (2d Cir. 2004) (quoting Harris, 510 U.S. at 23, 114 S. Ct. 367)).

"Notably, the Second Circuit has directed that in deciding whether the plaintiff suffered an atmosphere of hostility, courts must look to the totality of all the circumstances." Anderson v. Nassau County Dept. of Corr., 558 F. Supp. 2d 283, 294 (E.D.N.Y. 2008) (citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)). Moreover, "[w]hereas other disparate treatment claims may [require the court to] scrutinize discrete harms such as hiring or discharge," a claim which is premised upon a hostile work environment theory also compels an assessment of other factors that might affect the "workplace environment as a whole [so as] to discover whether it is

'abusive.'  Raniola, 243 F.3d at 617.  The court considers a number of factors, none of which is

determinative.  See Harris, 510 U.S. at 23, 114 S. Ct. 367; E.E.O.C. v. Int'l Profit Associates,

Inc., 654 F. Supp. 2d 767, 783 (N.D. Ill. 2009) (explaining that "[w]hether this standard is met

turns on a 'constellation of factors' ") (quoting Hostetler v. Quality Dining, Inc., 218 F.3d 798,

806 (7th Cir. 2000)).

> Hostile environment claims are different in kind from discrete acts.
> Their very nature involves repeated conduct.  The "unlawful
> employment practice" therefore cannot be said to occur on any
> particular day.  It occurs over a series of days or perhaps years and,
> in direct contrast to discrete acts, a single act of harassment may
> not [although it can] be actionable on its own.  Such claims are
> based on the cumulative effect of individual acts.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L.E.2d 106

(2002) (citations omitted).

    The factors considered by the court "may include the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."  See

Harris, 510 U.S. at 23, 114 S. Ct. at 371.  The Second Circuit has directed that "[t]he incidents

must be more than episodic; they must be sufficiently continuous and concerted in order to be

deemed pervasive."  Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989).

Nevertheless, it has been held that "if the alleged conduct is 'extraordinarily severe,' a single

incident . . . may create a hostile environment."  Wahlstrom v. Metro-N. Commuter R. Co., 89 F.

Supp. 2d 506, 520 (S.D.N.Y. 2000) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.

2000)).

    Here, the Plaintiff has alleged that the Defendants' conduct substantially interfered with

his work performance and disturbed his psychological well-being.  On more than one occasion,

the Plaintiff perceived the Defendants' actions as disrespectful, and thus, offensive. The Plaintiff further asserts that the Defendants embarrassed him in front of his peers, causing damage to his reputation. In addition, the Plaintiff has pointed to a few occasions where Defendant Im allegedly acted hostile to him, including one incident where Defendant Im physically touched him. The Court will assess each of these allegations to determine whether, individually or collectively, they state a claim for a hostile work environment.

First, the Plaintiff maintains that Defendant Im falsely accused him of substandard work performance and argues that this evaluation "was completely controverted by [his] previous record of production while employed by MetLife." (Compl., ¶ 36.) However, there are no allegations contained in the Complaint to suggest that the Defendants' critique of the Plaintiff's performance constituted ridicule or insult that is sufficiently severe to create a hostile work environment. Rather, the Complaint states that in or about September 2008, the Defendants issued a written letter of warning, which advised the Plaintiff that he was being placed on an "Action Plan" and his activity at work would be monitored. As it is standard for employers to periodically review and comment upon employees' performance at work, this factor fails to satisfy the requirement of objective hostility. In any event, as set forth above, this incident falls outside the statute of limitations and thus will not be considered as part of the hostile work environment claim.

The Plaintiff also asserts that the Defendants deprived him of a bonus by intentionally delaying the processing of his client applications and related documents. (Compl., ¶ 52–53.) The Court is unable to ascertain, based upon the limited facts contained in the Complaint, whether or not Defendants acted willfully in leaving Plaintiff's applications unattended for several weeks. It seems common, in the nature of the business, that the processing of loan

applications might be prolonged.  Regardless, this incident also falls outside the statute of limitations and thus will not be considered as part of the hostile work environment claim.

The Plaintiff further alleges that in or about October 2008, the Defendants issued to him a termination letter, informing the Plaintiff that his employment was terminated effective October 20, 2008.  With regard to this letter, Plaintiff makes a number of complaints.  First, he argues that he first received the letter nearly one week after his termination apparently took effect.  Second, the Plaintiff alleges that the Defendants terminated his employment even though he had "exceeded all required goals and standards for the period of time in question" and "met all conditions contained in the September 2008 letter of warning." (Compl., ¶ 46.)  Finally, the Plaintiff contends that the Defendants made his termination known to other employees at MetLife without first giving the Plaintiff a fair opportunity to challenge the cause of his termination.  In this regard, a bulletin board in the office listed the top writing agents, one of which was De La Pena.  Upon observing the list, the Plaintiff discovered the word "terminated" printed next to his name.  The Plaintiff allegedly discovered the list prior to receipt of the termination letter.

On its own, the issuance of a termination letter is not a sufficient ground to show a hostile work environment.  With regard to the allegation that his termination was listed on a bulletin board for everyone to see prior to receiving the termination letter, the Court agrees that the Plaintiff was likely humiliated that at least some of his fellow co-workers may have learned of his termination before he did.  Likewise, the Court notes that any reasonable person in this position would be embarrassed by his or her termination being made public in this manner.  In fact, regardless of whether or not Plaintiff had yet received the termination letter, it is still reasonable that the presence of this posting in the office would disrupt his work performance.

However, the Plaintiff admits that the very same day he discovered this list, he "immediately notified Ms. Gjonbalaj [his supervisor], who placed a piece of tape [on the list] to cover the word 'terminated.'" (Compl., ¶ 47.) Therefore, given the remedial action taken by the Defendants to shield the Plaintiff from continuous humiliation on the job, it is questionable whether this situation was severe enough to adversely affect the conditions of the Plaintiff's employment. Furthermore, the Court gives weight to the fact that on or about November 3, 2008, Plaintiff was given an opportunity to challenge his termination and his employment was reinstated. (Compl., ¶ 55.) Ultimately, in the Court's view, this incident is relatively minor and likely not severe enough to constitute a hostile work environment.

In addition, the Plaintiff claims that the Defendants purposefully denied him access to MetLife's computer system for a short period of time. (Compl., ¶ 39, 44.) Assuming the truth of this allegation; that the Defendants disabled the Plaintiff's username and password on a temporary basis, the severity and impact of this incident is insignificant. The Plaintiff alleges that he was denied access "in or about October 2008." (Compl., ¶ 39.) Even considering the Complaint in the light most favorable to the Plaintiff, this alone would not constitute a hostile work environment. See Hendricks v. Illinois Dep't of Human Servs., 80 Fed App'x 489, 491 (7th Cir. 2003) (finding that an allegation that the plaintiff's supervisors denied her access to client files fell short of the severe or pervasive conduct prohibited by Title VII).

Next, the Plaintiff maintains that the Defendants wrongfully requested that he sign an employee compensation plan acknowledgement, which he did not understand and should have signed at the beginning of his employment. (Compl., ¶ 40–42.) However, there are no specific facts alleged in the Complaint that would indicate or otherwise allow for the inference that Defendants forced the Plaintiff to sign the form or any other indices that this was hostile

behavior.  In addition, although the Plaintiff argues that he could not access the computer system to retrieve the relevant plan documents on his own, he simultaneously admits that "Theresa Arcea, a Team Manager, printed copies of the terms and conditions for [him to] review.  (Id.) Without more, this Court finds the mere fact that Plaintiff "felt pressured to sign the acknowledgement" without fully comprehending the terms (Pl.'s Motion in Opp. at 4) is not sufficiently severe so as to create an abusive environment and negatively impact his work.

Lastly, the Plaintiff contends that Defendant Im engaged in an ongoing and continuous course of conduct, in which he treated Plaintiff disrespectfully.  Beginning from the time that Defendant Im first issued De La Pena a written warning about his performance on the job, the Plaintiff contends that Defendant Im made false accusations against the Plaintiff which prompted him to be put on the Action Plan, specifically alleging that Defendant Im had "completely controverted" the Plaintiff's previous record of production.  (Id. at 35–36.)  As set forth above, this allegation is untimely and thus cannot be considered as part of the Plaintiff's hostile work environment claim.

The Plaintiff points to two additional occasions, alleging that Defendant Im acted in an overtly abusive manner.  (Id. at 51–57.)  First, on October 28, 2008, in the context of a meeting that was scheduled to discuss the Plaintiff's notification that he was terminated, the Plaintiff contends that Defendant Im arrived three hours late to their meeting. (Id. at 51.)  In this regard, the Plaintiff argues that Defendant Im intentionally arrived late for the purpose of continuing to interfere with his ability to carry out his job duties.  While this action was sufficiently hostile from the Plaintiff's subjective point of view, the Court finds that a reasonable person in the Plaintiff's position would not perceive the mere fact that his or her supervisor was late to one meeting as a hostile action so severe as to create an abusive work environment.

Second, the Plaintiff identifies an additional episode with Defendant Im, on November 18, 2008, in which Defendant Im once again made false accusations, but on this occasion, took his hostility towards the Plaintiff to a new level—acting in a "cantankerous and threatening" manner and hitting Plaintiff in the back.  (Id. at 56.)  The Plaintiff claims that Defendant Im first wrongfully accused him of arriving late, and at that time, "without just cause" and "without provocation," Defendant Im raised his right hand and used it to hit the Plaintiff in the back.  (Id.)  After Defendant Im hit the Plaintiff, pushing him forward into a desk, the Plaintiff alleges that Defendant Im stated "This is not the kind of business that you deserve to pursue, and we ask you to leave MetLife."  (Id. at 57).  The Plaintiff stated that this act occurred "in the presence of another", but no particular person is identified by name in the complaint.

With regard to this final incident, the Second Circuit has not ruled out the possibility that a single incident of physical contact might be so pervasive as to justify a hostile work environment claim.  See Redd v. New York Div. of Parole, 678 F.3d 166, 177 (2d Cir. 2012) ("The line between complaints that are easily susceptible to dismissal as a matter of law and those that are not is indistinct") (citing Schiano, 445 F.3d at 605).  Rather, it is well settled that "depending on the circumstances," [there are] gradations of abusiveness."  Id.  As the Second Circuit has explained in the context of sexual harassment:

> Casual contact that might be expected among friends—[a] hand on the shoulder, a brief hug . . . [are] unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection . . . [e]ven more intimate or more crude physical acts . . . may be considered insufficiently abusive to be described as "severe" when they occur in isolation . . ..  But when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.

Id. (quoting Patton v. Keystone RV Co., 455 F.3d 812, 816 (7th Cir. 2006) (internal quotation marks omitted).

In <u>Divers v. Metropolitan Jewish Health Systems</u>, No. 06 Civ. 6704, 2009 WL 103703 (E.D.N.Y. Jan. 14, 2009), the plaintiff's allegation of physical contact was not sufficient to support a hostile work environment claim because "it was an isolated occurrence insufficient to trigger § 1981." <u>Id.</u> at *16 (noting however, that the other complaints plaintiff put forth were also relatively minor in nature, which impacted the court's ruling). As another example, the hostile work environment claim in <u>Aina v. City of New York</u>, No. 05 Civ. 7533, 2007 WL 401391 (S.D.N.Y. Feb. 6, 2007), was also dismissed after the court concluded that the "isolated and ultimately inconsequential incident—in the absence of even a single additional occurrence of alleged physical aggression" did not support a sustainable cause of action. <u>Id.</u> at *6. The physical contact alleged in <u>Aina</u> was a supervisor "slam[ing] the door in such a violent manner that it almost hit [plaintiff's] knees." <u>Id.</u>

While the conduct alleged here, if true, should not be condoned in the workplace, it nevertheless only establishes a single incident of minor physical conduct that would be insufficient to establish a hostile work environment claim. <u>See Ricks v. Conde Nast Publications, Inc.</u>, 92 F. Supp. 2d 338, 348 (S.D.N.Y. 2000) (holding that an allegation that a defendant hit the plaintiff on the shoulder and pushed her out of her office was insufficiently severe to establish a hostile work environment claim); <u>see also Meriwether v. Caraustar Packaging Co.</u>, 326 F.3d 990 (8th Cir. 2003) (finding a single incident of a co-worker's squeezing of employee's buttocks, and subsequent "joke" about such conduct, did not rise to level of severe or pervasive conduct). <u>Cf. Ferris v. Delta Air Lines, Inc.</u>, 277 F.3d 128, 136 (2d Cir. 2001) ("We have no doubt a single incident of rape" can satisfy the requirement that the harassment be sufficiently severe or pervasive to alter the conditions of employment), cert. denied, 537 U.S. 824 (2002); <u>Al– Dabbagh v. Greenpeace, Inc.</u>, 873 F. Supp. 1105, 1108, 1111

(N.D. Ill. 1994) (determining that a single incident was sufficiently severe where the perpetrator co-employee "slapped [plaintiff], tore off her shirt, beat her, hit her one the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him").

As one district court noted, "[c]ourts rarely find limited incidents of physical violence without a sexual element to establish a hostile work environment." Gerald v. Locksley, 849 F. Supp. 2d 1190, 1234 (D. N.M. 2011). If a single non-sexual incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (noting that isolated comments or incidents, unless extremely serious, are not actionable under Title VII). Here, De La Pena does not allege that he sought or required hospitalization; indeed, it does not appear that he suffered any physical injuries at all. The brief encounter between De La Pena and Im was highly offensive, but the Court cannot find that this harassment on a single occasion for a matter of minutes is sufficient.

In sum, whether these instances are viewed independently or collectively, they fail to reach the requisite severity level in order to adequately state a claim for a hostile work environment.

### 2. Connection Between the Alleged Hostility and Protected Status

Even if the Plaintiff did sufficiently allege the existence of a hostile work environment, he would still need to allege a connection between the alleged hostility and his protected status, in order to sufficiently state a hostile work environment claim under Title VII, Section 1981, or the ADEA. Although it has been held that "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination occurred," (Svenningsen v. Coll. Of Staten Island, No. 01 Civ. 7750, 2003 WL

21143076, at *1, *2 (E.D.N.Y. Mar. 23 2003)), a plaintiff must still establish that the "circumstances in which 'the incidents [occurred] can reasonably be interpreted as having taken place on the basis of that trait or condition.'" <u>Divers</u>, 2009 WL 103703, at *15; <u>cf.</u> <u>Alfano v. Costello</u>, 294 F.3d 365, 377 (2d Cir. 2002) (noting that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent").

Here, even in light of the number of allegations explored above that could possibly be utilized as the basis for the existence of a hostile work environment, none of these incidents demonstrate any animus based upon a protected characteristic. As with the Plaintiff's employment discrimination claims, the hostile work environment claims fail because there are no allegations that any animus subjective or objective stemmed from the Plaintiff's "membership in a protected class." The fact that the Plaintiff was the only Filipino in the office does not create a plausible inference of hostility based upon race or national origin. Nor does the fact that the Plaintiff is sixty years of age necessarily create a plausible inference of hostility based upon age.

There is simply nothing alleged to demonstrate that his protected characteristic factored into the Defendants' alleged actions. <u>See Wilson v. Kautex, Inc.</u>, No. 07 Civ. 60, 2009 WL 16574563, at *18 (N.D. Ind. June 10, 2009) ("Accordingly, the Court concludes that denying the Plaintiff access to the computer systems was not related to her race or gender and was not harassment, so it did not contribute to any hostile work environment.").

In sum, the Court agrees with the Defendants' contentions, observing first that the factual allegations in the Complaint fail to satisfy the severity required to plead a hostile work environment theory. Furthermore, in the Court's view, the Plaintiff has wholly failed to plead

that a hostile work environment was created and existed because of his protected status, either race, color, national origin, or age. The Plaintiff has not adequately pled a causal connection between his protected status and the alleged hostile work environment in order to preserve his causes of action pursuant to Title VII, Section 1981, or the ADEA under a hostile work environment theory. Thus, the hostile work environment claims are all dismissed, without prejudice.

**E.      As to Defendant Deas' Liability**

Before analyzing the final allegations of constructive discharge, the Court notes that even if a Section 1981 claim were adequately pled, the Complaint does not sufficiently state a cause of action as against Defendant Deas. Pursuant to Section 1981, the Plaintiff asserts individual liability against Defendant Im and Defendant Deas based on a hostile work environment. In general, a plaintiff must show that the individual was personally involved in the alleged violations of rights in order to establish individual liability under Section 1981. <u>Patterson</u>, 375 F.3d at 229. An individual cannot be held liable without establishing "some affirmative link to causally connect the actor with the discriminatory action." <u>Whidbee</u>, 223 F.3d at 75. "Where personal involvement is not satisfactorily pled, the court may dismiss the claim on a motion to dismiss." <u>Fahmy v. Duane Reade, Inc.</u>, No. 04 Civ. 1798, 2005 U.S. Dist. LEXIS 20929, at *14 (S.D.N.Y. Sep. 26, 2005).

The Court finds that the Plaintiff has not asserted a viable claim against the Defendant Deas. While an employee can be held individually liable under Section 1981, there is nothing plead in the Complaint to suggest either that Defendant Deas (i) knew of the hostility to which Plaintiff was a victim and failed to take remedial action; or (ii) had a "de facto duty" to pass on the Plaintiff's complaints about hostility at work. In addition, Deas had no personal involvement

with any of the allegation violations of rights. The Plaintiff does not allege that Ms. Deas was personally involved in the alleged disparate treatment or the alleged harassing behavior. Therefore, the Plaintiff's hostile work environment claim against Defendant Deas is also dismissed on this ground, with prejudice.

**F.    As to the Plaintiff's Constructive Discharge Claim**

The Plaintiff also asserts that the cessation of his employment was not voluntary. Rather, the Plaintiff contends that the Defendants engaged in a course of conduct, which, accepting the truth of the facts alleged in the complaint, could be construed as constituting an constructive discharge. On the other hand, the Defendants argue that the Plaintiff walked out of work without making any complaint or providing any explanation for his conduct, refused to return to his position of employment despite Defendants' requesting that he do so, and consequently abandoned his employment.

For a court to find a constructive discharge, a plaintiff must show that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d Cir. 2003) (holding that allegations of constructive discharge, "viewed as a whole, [must be] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign"). Further, "[w]hether working conditions are sufficiently intolerable to constitute a constructive discharge 'is assessed objectively by reference to a reasonable person in the employee's position.'" Borski v. Staten Island Rapid Transit, 413 Fed. App'x. 409, 411 (2d Cir. 2011) (quoting Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004)). The standard for constructive discharge is a demanding one because it "cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were

difficult or unpleasant." Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993);

Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001) (noting that "[t]he

standard for constructive discharge is even higher" than that used to show a hostile work

environment); see also Madray v. Long Island Univ., 789 F. Supp. 2d 403, 410 (E.D.N.Y. 2011)

(observing that "vague, general allegations, quite incapable of inviting a meaningful EEOC

response [cannot be relied upon as a] predicate [for] subsequent claims in the federal lawsuit").

    With regard to the claim of a constructive discharge, De La Pena does not include a

separate count in the Complaint based upon constructive discharge, nor does he discuss in his

Opposition papers the standards applicable to such a claim or whether or not his allegations

satisfy such standards. "A claim for hostile-work-environment constructive discharge is distinct

from a garden-variety hostile work environment claim and has different legal standards

altogether." Castagna v. Luceno, 2011 WL 1584593, at *10 n.6 (S.D.N.Y. Apr. 26, 2011) (citing

Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010)).

Notwithstanding this omission, to the extent that the Complaint can be read to assert a claim for

constructive discharge, the allegations contained therein are insufficient to state such a claim.

For similar reasons as to why the Plaintiff has not stated a claim for a hostile work environment,

the Plaintiff has not pled a sufficiently intolerable work place to make out a claim for

constructive discharge. See Miller v. Praxair, Inc., No. 05 Civ. 402, 2009 WL 1748026, at *6

(D. Conn. June 18, 2009) ("A constructive discharge claim must entail something more than

what is required for an ordinary sexual harassment or hostile-environment claim."). Thus, as the

Plaintiff has not pled sufficient facts to allege a constructive discharge claim, it is dismissed

without prejudice.

**G.    As to the Plaintiff's Claims for Compensatory and Punitive Damages Under the ADEA**

The last ground for the Defendants' motion to dismiss is in connection with the Plaintiff's ADEA claim, in which he seeks as relief compensatory damages for physical and emotional distress, including embarrassment and humiliation; damage to his reputation; and punitive damages.  (Compl., ¶91, 86, 87 and Prayer for Relief).  However, the Court agrees with the Defendants that such damages are not available under ADEA.  "The only available remedies are make-whole remedies such as back pay, front pay and reinstatement."  Castro v. City of New York, 2012 U.S. Dist. LEXIS 23210, at *3 (S.D.N.Y. Feb. 23, 2012) (quoting Hatter v. New York City Hous. Auth., 1998 U.S. App. LEXIS 27571, at *3 (2d Cir. Oct. 22, 1998); see Daingneault v. Eaton Corp., No. 04 Civ. 984, 2008 WL 410582, at *3 (D. Conn. Feb. 12, 2008).  In fact, the Plaintiff concedes that damages for physical and emotional distress, damage to reputation, and punitive damages are not available under the ADEA.  Accordingly, the Plaintiff's claim for physical and emotional distress and reputational damages and for punitive damages under Count III in the Complaint is dismissed with prejudice.

As a final matter, the Plaintiff has requested that this Court permit him to file an amended complaint in the case that the Court grants the Defendants' motion to dismiss.  Because several of the claims asserted by the Plaintiff lack sufficient factual allegations to survive the within motion to dismiss but, according to the Plaintiff, may be sustained in the future with additional and more specific factual allegations as set forth in this Order, the claims are dismissed *without prejudice* so that Plaintiff has an opportunity to amend the complaint.  If the Plaintiff wishes to do so, he is directed to file and serve an amended complaint within twenty (20) days of the date of this Order.  To be clear, the Plaintiff is not permitted to reassert the previously withdrawn

claims pursuant to the New York City Human Rights Law nor may he reassert his claims against

Defendant Deas.

### III.    CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED**, that Defendants' motion to dismiss the Complaint is granted in its entirety

without prejudice as to the causes of action referred to in this opinion; and it is further

**ORDERED**, that the Plaintiff is granted leave to file and serve an amended complaint

within twenty (20) days of the date of this Order.

**SO ORDERED**.

Dated:  Central Islip, New York
        January 11, 2013

\_\_\_\_\_*/s/ Arthur D. Spatt*_____
            ARTHUR D. SPATT
            United States District Judge