**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
ABDON DE LA PEÑA

       Plaintiff,

      -against-

METROPOLITAN LIFE INSURANCE
COMPANY AND SANG IM,

       Defendants.

_____X

**MEMORANDUM OF DECISION**
**AND ORDER**
12-CV-0766 (ADS) (ETB)

**APPEARANCES:**

**WOLIN & WOLIN**
*Attorneys for the Plaintiff*
420 Jericho Turnpike, Suite 215
Jericho, NY 11753
      By: Alan E. Wolin, Esq., of Counsel

**MARGOLIS & TISMAN LLP**
*Attorneys for the Defendants*
280 Madison Avenue, suite 500
New York, NY 10016
      By: Stephen E. Tisman, Esq., of Counsel

**SPATT, District Judge.**

On February 22, 2012, the Plaintiff Abon De La Peña ("the Plaintiff")

commenced this employment discrimination action against the Defendants Metropolitan

Life Insurance Company ("MetLife"), and two individual employees, Sang Im ("Im"), a

Manager Director at MetLife, and Kathy Deas ("Deas"), an operations Manager at

MetLife. In his original Complaint, the Plaintiff brought discrimination claims against

MetLife, Im, and Deas subject to 42 U.S.C. § 1981 *et seq,* in which he alleged that the

Defendants engaged in unlawful employment practices, discriminated against him, and

subjected him to disparate treatment because of his race/color and/or national origin. The Plaintiff also brought a separate discrimination claim pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e *et seq* ("Title VII"), against MetLife alleging that it subjected him to a hostile work environment due to his race/color and/or his national origin and also that he was actually or constructively discharged from his employment.  Finally, the Plaintiff alleged that Defendant MetLife violated the Age Discrimination Act in Employment Act, 29 U.S.C. § 621 *et seq* ("ADAE"), by denying him equal opportunities and subjecting him to a hostile work environment because of his age.

The Defendants moved to dismiss the original complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for failure to state a claim upon which relief can be granted.  The Court granted the motion and dismissed the complaint with leave to file an amended complaint. (Mem. of Decision and Order, at 44.)

The Plaintiff then served an amended complaint again asserting claims pursuant to Title VII and 42 U.S.C.  § 1981 *et seq* ("Section 1981") against MetLife and Im. However, the Plaintiff no longer asserts any claim under the ADEA, nor does the Plaintiff pursue any claim against Deas.  In particular, the Plaintiff alleges that the Defendants engaged in a discriminatory course of conduct against him based on his race/color and/or national origin.  The Plaintiff also maintains that the Defendants created or subjected him to a hostile work environment due to his affiliation with a protected class.  The Plaintiff further contends that his position of employment with MetLife ceased as a result of the Defendants' activities, which constituted an actual or constructive discharge.

Presently before the Court is the Defendant's motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim.

## I.     BACKGROUND

The Amended Complaint now before the Court is substantially similar to the original Complaint and contains few changes, which will be addressed in more detail below.  The following facts have been drawn from the original Complaint and have been restated in the Amended Compliant.  All the alleged facts are viewed in a light most favorable to the Plaintiff.

The Plaintiff is a sixty-year-old American citizen of Asian/Filipino descent.  On June 13, 2005, the Plaintiff was employed by MetLife as a Financial Representative in a sales office located at 35-01 30th Avenue, Astoria, New York.  In or about August 2008, Im, a Managing Director for MetLife, became the Plaintiff's supervisor.  Im remained as the Plaintiff's advisor for the duration of his employment with MetLife.

Uka Gjonbalaj, who is not named as a party but is named in the Plaintiff's Complaint, was also employed by MetLife as a Sales Director and acted as the Plaintiff's direct supervisor.  Gjonbalaj introduced the Plaintiff to Im in August of 2008, and advised the Plaintiff that Defendant Im would be his primary supervisor.

With regard to the complained of actions and lack of action, the Plaintiff alleges that he was qualified to work at all times during his period of employment and was not fired due to any work inefficiency.  Rather, the Plaintiff alleges that during the course of his employment, MetLife, as well as its agents and employees, undertook an unlawful course of conduct by deliberately discriminating against him based on his race/color

and/or his national origin. In response, the Defendants contend that any action or lack of action taken against the Plaintiff was unrelated to his race/color or national origin.

Initially, in this factual scenario, in or about September 2008, the Plaintiff received a written warning advising him that his production on the job fell below the MetLife standard and the Plaintiff was subsequently placed on an "Action Plan" under which the Plaintiff's job-related performance would be monitored.

On October 21, 2008, the Plaintiff was advised that his position at MetLife was discontinued and he was terminated. This occurred even though his revenue contribution to the company had exceeded the company's goals and standards laid out in the "Action Plan" previously given to the Plaintiff. The Plaintiff also notes that in between the time that the Plaintiff was informed that he was going to be terminated and when he allegedly received the October termination letter, the Plaintiff discovered a list of "Top Ten Writing Agents" on which his name was placed, but which also had the word "terminated" printed adjacent to it. The Plaintiff allegedly brought this to the attention of his supervisors, asserting that it created a hostile and embarrassing work environment for him and was intentionally placed there to harm him. Gjonbalaj ultimately covered up the word "terminated" with a piece of tape.

Also, the Plaintiff alleges that, during the week of October 20, 2008, his access to the computer system used by, and provided to all MetLife sales representatives, was denied to him without justification. The Plaintiff alleges that MetLife had a duty to provide him with such access as it was necessary to carry out his job responsibilities. In doing so, the Plaintiff alleges that he could not transact business and access documents relating to his own employment. The Plaintiff cites an instance in which he was deprived

access to a "Compensation Plan Acknowledgment," which he was ultimately pressured to sign after receiving a physical copy and not having the requisite time to read and understand it.

On October 27, 2008, after receiving the termination letter, the Plaintiff and Gjonbalaj exchanged text messages regarding the end of the Plaintiff's employment. Gjonbalaj asked the Plaintiff to come in the following day to meet with Im. On October 28, 2008, the Plaintiff arrived at Im's office at 11:00 a.m., and waited until 2:00 p.m. for Im to arrive. During their meeting, the Plaintiff raised several complaints including: (1) how he had timely finished his work, but employees and agents of MetLife delayed processing his work; (2) the Defendants had treated him disrespectfully; (3) he had not received his promised bonus due to delays; and (4) that he should not have been fired after meeting and exceeding all the goals set for him. After finding that the Plaintiff had in fact met all the expectations set out for him, the Defendants reinstated his employment.

The Plaintiff remained employed at MetLife until November 18, 2008, at which time he alleges he was actually or constructively discharged. The Plaintiff also alleges that that he did not at any time abandon his employment. The Plaintiff specifically asserts that, on November 18, 2008, in a follow-up meeting, Im wrongfully accused the Plaintiff of being late to a meeting and, without provocation, hit the Plaintiff on the back causing the Plaintiff to be pushed forward into a desk. The Plaintiff described Im's behavior and actions in that meeting as "cantankerous and threatening." At the same time, the Plaintiff alleges that Im told Plaintiff that "this is not the kind of business that you deserve to pursue, and we ask you to leave MetLife." The Plaintiff alleges that upon hearing this, he turned over his laptop and computer files, which Im's secretary readily

accepted, and he never returned to MetLife. The Plaintiff further alleges that he was the only Filipino in his office. The Plaintiff interprets this series of events as an actual or constructive discharge of his employment with MetLife based on his race/color and/or national origin.

In response, the Defendants alleged that the Plaintiff voluntarily abandoned his employment in November 2008 and was formally terminated effective March 4, 2009. (Tisman, Decl. Ex. C at 2.) The Defendants' proffered documentary evidence of continued communications between the Plaintiff and the Defendants after the Plaintiff's last day of work in November 2008. This evidence includes written correspondence affirming that the Plaintiff was still employed by MetLife and which also directed the Plaintiff to return to work. (See id.) Plaintiff also submitted a written response acknowledging his absence from work and stating that he would not return unless Im was replaced. (See id.) Thereafter, on March 3, 2009, following the Plaintiff's confirmation that he did not intend to return to work, MetLife terminated his employment for "job abandonment." (id.)

## II.     Procedural History

### a.     As to Plaintiff's EEOC and NYSDHR Claims

As a result of the foregoing, on July 17, 2009, the Plaintiff filed a Verified Complaint with the New York State Division of Human Rights ("NYSDHR") as well as a dual complaint with the Equal Employment Opportunity Commission ("EEOC") pursuant to Executive Law, Article 15. (Defs.' Motion Ex. B.) In each complaint, the Plaintiff alleged that the Defendants engaged in unlawful employment practices and discriminated against him due to his age, race/color, and national origin.

On June 24, 2011, the NYSDHR, after an investigation, dismissed the complaint concluding that there was no probable cause for the claims asserted. (Defs.' Motion Ex. C.) Among other reasons, the NYSDHR found that, contrary to the Plaintiff's contentions, he was not terminated on November 18, 2008. Based on correspondence exchanged between the Plaintiff and MetLife, the NYSDHR found that Plaintiff was advised to return to work, but refused to do so unless MetLife agreed to replace Im. (See Id.) The NYSDHR essentially concluded that the Plaintiff was not discharged, but rather, that he had abandoned his employment. (See Id.) The NYSDHR also found that: (1) there was a lack of evidence to establish that other employees were treated more favorably than the Plaintiff; (2) there was no nexus between the adverse employment action and the Plaintiff's race/color and/or national origin; (3) the Plaintiff failed to alert MetLife to any prior complaints of alleged discrimination, as necessary to maintain a claim asserted for "Opposed discrimination/retaliation;" (4) the Plaintiff failed to substantiate the claim that Im had struck the Plaintiff; and (5) the Plaintiff failed to refute the legitimate, non-discriminatory reason raised by the Defendants to explain the actions and lack of actions taken against the Plaintiff. (See Id.)

On September 27, 2011, the EEOC issued and mailed to the Plaintiff a "Dismissal and Notice of Rights," advising him that a Title VII or ADEA action related to the claims he had asserted needed to be brought within 90 days. However, the Plaintiff alleges that he did not receive the Notice of Rights until November 23, 2011 and because that fact is unchallenged and also because the facts are viewed in the light most favorable to the Plaintiff, the Plaintiff's claims are found to be timely. On February 16, 2012, the

Plaintiff ultimately commenced this action, 142 days after the issuance of the Notice of Rights.

The Plaintiff commenced this action asserting claims under Title VII, the ADEA, and Section 1981, alleging that the Defendants discriminated against him on account of his race/color and/or national origin and that the Plaintiff was subjected to a hostile work environment and either actually or constructively discharged. The Defendants then moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claim upon which relief can be granted.

### b.    As to the Courts Dismissal of the Plaintiff's Original Complaint

The Court dismissed the original complaint without prejudice for a failure to state a claim upon which relief could be granted. In particular, the Court rejected as time-barred some of the Plaintiff's allegations. The Plaintiff filed his Complaint with the EEOC on July 17, 2009. However, the Plaintiff's allegations with regard to the written warning memorandum dated September 17, 2008 and the complaints of alleged delays caused by the Defendants in processing the Plaintiff's client applications occurred more than 300 days prior to that date. Thus, the Court deemed these allegations to be untimely as each of the stated events that occurred prior to September 20, 2008 and were far enough in the past to be barred by the statute of limitations. The Court also declined to apply the exception to the statute of limitations for allegations made under the doctrine of "continuing violation." In doing so, the Court reasoned that the Plaintiff's allegations did not suffice to show that the Defendant's actions were related to a discriminatory policy or mechanism.

The Court then analyzed the Plaintiff's discriminations claims based on Title VII, the ADEA and Section 1981 against MetLife, Im, and Deas. The Court observed that, while the burden of pleading is eased in an employment discrimination claim, a plaintiff must still at a minimum establish those facts necessary to establish liability on the part of the employer, that is, there must be sufficient facts to draw a plausible inference that the plaintiff can satisfy their *prima facie* case. (Mem. of Decision and Order, 19.) While the Plaintiff was able to show that he belonged to a protected group and some of the Defendants'' actions constituted "adverse employment actions," the Court found that the Plaintiff could not satisfy his burden with respect to raising a plausible inference that the Defendants' actions were based on the Plaintiff's protected status. (Mem. of Decision and Order, at 19–23.)

The Court recognized that the only facts that were alleged which related to the Plaintiffs protected status were that the Plaintiff was the only Filipino employed in his office; neither individual defendant was Filipino; and the Plaintiff was allegedly singled out and was the only person treated differently. However, the Court found that there were not enough alleged facts to find that the Plaintiff was actually treated disparately. The Court noted that while the Plaintiff was not required to compare how he, as opposed to other similarly situated employees, was treated, there was still not enough factual allegations to infer that a plausible claim existed on which liability could be imposed with respect to the Plaintiff contention that he had been targeted for adverse employment action as a result of his membership in a protected class. (Mem. of Order and Decision, at 23–25.)

Having held that the Plaintiff's discrimination claim based on a disparate treatment theory could not survive the motion to dismiss, the Court inquired into whether such a claim could survive under a hostile work environment theory. The Court assessed multiple allegations made by the Plaintiff in order to determine whether, individually or collectively, they stated a hostile work environment claim.

First, the Court concluded that Im's allegedly false accusation related to the Plaintiff's substandard work performance, which the Plaintiff argued was controverted by his previous record of production while employed at MetLife, was not sufficient to constitute a hostile work environment. The Court noted that there were no allegations to suggest that the Defendants' critique of the Plaintiff's performance constituted ridicule or insult that was sufficiently severe enough to create a hostile work environment. Indeed, the Court noted that the Plaintiff only alleged that he was issued a written letter of warning, which advised him that he was being placed on an "Action Plan" and his activity at work would be monitored. The Court found such periodic review and monitoring were standard procedures for many employers and such an action would fail to satisfy the requirement of objective hostility. Also, as noted above, the Court held that this allegation by the Plaintiff would be untimely in any event. (Mem. of Order and Decision, at 33.)

The Court also rejected as insufficient the Plaintiff's assertion that the Defendants deprived him of a bonus by intentionally delaying the processing of his clients' applications and related documents. The Court noted that the Plaintiff failed to allege facts that would show that the Defendants acted willfully in leaving the Plaintiff's application unattended for several weeks. Also, it may not be uncommon, given the

nature of the business, that the processing of loan applications might be prolonged. In addition, the Court stated that this allegation also fell outside the statue of limitations as noted above. (Mem. of Decision and Order, at 33–34.)

The Court also found that the Plaintiff's additional allegations concerning his termination in or around October 20, 2008 to be insufficient to state a claim under a hostile work environment theory. The Plaintiff's complaints about receiving a termination letter, and being terminated even though he had exceeded all the goals set for him, and that the Defendants made his termination known to other employees without first giving him a warning, failed to satisfy the Plaintiff's burden of creating at least a plausible inference that a hostile work environment existed.

The Court also determined that the issuance of a termination letter was not a sufficient ground to show a hostile work environment. With regard to the Plaintiff's allegation that his termination was listed on a bulletin board for everyone to see prior to receiving the termination letter himself, the Court agreed that the Plaintiff was likely humiliated since at least some of his fellow co-workers may have learned of his termination before he did. Similarly, the Court noted that any reasonable persons in this position would be embarrassed by his or her termination being made public in this manner. In fact, regardless of whether or not the Plaintiff had yet received the termination letter, the Court found that it was still reasonable that the presence of this posting in the office would disrupt his work performance and embarrass him. However, the Court noted that the Plaintiff admitted that on the very same day that he discovered this list, he immediately notified Gjonbalaj, who placed a piece of tape over the word "terminated." Thus, because remedial action was taken by the Defendants in order to

shield the Plaintiff from continuous humiliation, the Court found that it was questionable whether this situation was severe enough to adversely affect the conditions of Plaintiff's employment.

In addition, the Court found that the Plaintiff's claims that the Defendants purposefully denied him access to MetLife's computer system for a short period of time, even if construed in the light most favorable to the Plaintiff, would not constitute a hostile work environment. Similarly, the Court found that the Plaintiff's assertion that the Defendants required him to sign an employee compensation plan acknowledgement, which he did not understand and should have signed at the beginning of his employment, also did not raise a plausible inference that a hostile work environment was indeed created. The Court determined that the Plaintiff's assertion that he "felt pressured to sign the acknowledgement" when he did not fully understand it, without more, was not sufficient for the Court to infer that a severe or abusive work environment had been created on the part of the Defendants. (Mem. of Order and Decision, at 34 – 35.)

The Court also considered two instances in which the Plaintiff alleges that Im acted hostile towards him, due solely to his race/color and/or national origin, which contributed towards creating a hostile work environment. The Plaintiff contends that in one instance, the Plaintiff arrived at Defendant Im's office as directed and waited for three hours until the Defendant showed up. Also in another event, Im physically touched him in a hostile manner. With respect to the incident in which the Plaintiff alleged that Defendant Im intentionally showed up late for the purpose of continuing to interfere with his ability to carry out his job duties, the Court found that a reasonable person in the Plaintiff's position would not perceive the mere fact that his or her supervisor was late to

one meeting as a hostile action so severe as to create an abusive work environment. (Mem. of Order and Decision, at 35.)

With respect to the second instance in which Im acted cantankerously and threatening towards the Plaintiff and hit him on the back, the Plaintiff alleged that Im first wrongfully accused him of arriving late, and at that time, without cause or provocation, raised his hand and used it to hit the Plaintiff pushing him forward into a desk. The Plaintiff also alleged that Im stated "[t]his is not the kind of business that you deserve to pursue, and we ask you to leave MetLife." However, the Court pointed out that while the Second Circuit has not ruled out the possibility that a single incident of physical contact might be so pervasive as to justify a hostile work environment claim, it is well settled that, "depending on the circumstances, [there are] graduations of abusiveness." The Court thus found that the facts alleged by the Plaintiff only established a single incident of minor physical conduct that would be insufficient to establish a hostile work environment claim and this claim was ultimately dismissed as well.

In sum, the Court determined that, whether these instances were viewed independently or collectively, the Plaintiff's allegations had failed to reach the requisite level of severity to adequately state a claim under a hostile work environment theory.

However, the Court observed that even if the Plaintiff's allegations proved to satisfy the requirements to plead a hostile work environment, the Plaintiff failed to connect the circumstances in which the incidents occurred, to a trait or condition possessed by the Plaintiff. The Court noted that the only allegation concerning the protected status of the Plaintiff was that he was the only Filipino in his office. The Court held that this fact, standing alone, was insufficient to raise a plausible inference that a

hostile work environment was created for the Plaintiff solely due to his race/color and/or his national origin. (Mem. of Decision and Order, at 39–40.)

The Court also dismissed the Section 1981 claim, which the Plaintiff brought against Deas, as well as an ADEA claim against MetLife. The Court found that the Plaintiff had neither stated nor implied any facts that could suggest his age was a factor in his termination. Thus, the Court observed that it could not plausibly be found that the Plaintiff's age was a motivating factor, or even the *but for* cause of his termination, and therefore, the Plaintiff's claim failed. (Mem. of Decision and Order, at 28–29.) Similarly, this Court recognized that there was nothing plead in the Complaint to suggest either that Defendant Deas knew of the hostility to which the Plaintiff was a victim and failed to take remedial action, or that she had a duty to pass on the Plaintiff's complaints about the hostility at work. Also, because Deas was not actually involved in the harassing behavior herself, the Court found that there was no plausible claim that could be held against her and the Court dismissed the claim against her with prejudice. (Mem. of Decision and Order, at 40 – 41.)

Finally, the Court declined to hold that the Plaintiff had been constructively discharged, reasoning that the Plaintiff's work atmosphere was not so intolerable that the employee was forced to quit. In reaching this conclusion, the Court observed that the standard for a constructive discharge claim is even higher than that of the typical hostile work environment claim and since the Plaintiff's factual allegations were not sufficient to support a hostile work environment claim, they similarly could not support a constructive discharge claim. (Mem. of Order and Decision, at 41-42.)

### c.    As to the Plaintiff's Amended Complaint

While the Plaintiff originally asserted seven discrimination claims, he only pursued four of those claims in his original complaint. Following the dismissal of he original complaint, the Plaintiff's Section 1981 claim against Deas was dismissed with prejudice. The Plaintiff thus brought an Amended Complaint, which is currently before the Court, and in which he brings the three outstanding claims from the original comlaint.

First, the Plaintiff alleges that MetLife engaged in unlawful employment practices, discriminated against him, and subjected him to a hostile work environment because of his race/color. Second, the Plaintiff asserts that MetLife engaged in unlawful discrimination by subjecting him to a hostile work environment because of his national origin. Both of these claims are once again brought against MetLife pursuant to Title VII of the Civil Rights Act of 1964. Third, the Plaintiff alleges that all the defendants violated 42 U.S.C. §1981, discriminating against him by subjecting him to disparate treatment based upon his race/color. The Plaintiff also claims that he was actually or constructively discharged and that Defendants' actions were "pervasive, ongoing, and adversely affected his job status and responsibilities, making it extremely difficult to carry out his day-to-day duties." (Amnd. Compl., ¶¶ 63-81.)

The Plaintiff has also raised several new factual allegations. The Plaintiff now alleges that when Gjonbalaj introduced Im to the Plaintiff, Im stated, "Filipinos are heavy beer drinkers. Are you?" The Plaintiff contends that this remark was derogative and suggested that Filipinos, such as the Plaintiff, are alcoholics and cannot perform their job duties or responsibilities. (Amnd. Compl., ¶¶ 27-28.) The Plaintiff also alleges that no similarly situated employee was treated in the same manner.

The Plaintiff further asserts that he was required to go on disability leave. However, the Plaintiff alleges that while recovering from back treatment, the Defendants compelled him to return to work. This allegedly occurred while another Caucasian employee had continued to stay on disability leave for three years without any interference by the Defendants. (Amnd. Compl., ¶¶ 61-62.)

Again, the Defendants move to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Defendants contend that certain claims under Title VII must be dismissed because they are untimely, occurring more than 300 days before the Plaintiff filed his amended complaint. The Defendants also contend that the Plaintiff has failed to allege facts sufficient to state a claim for relief for discrimination or a hostile work environment. Further, the Defendants maintain that Im is insulated from individual liability pursuant to 42 U.S.C. §1981, and thus, all of those claims brought against him must be dismissed.

Also, the Defendants assert that even considering the Plaintiff's newly added allegations, the Plaintiff's Amended Complaint fails as a matter of law. The Defendants contend that the newly alleged facts, even if true, amount to nothing more than stray remarks with no connection to discrimination. Finally, Defendants maintain that none of their actions are connected in any way with any adverse action taken against the Plaintiff with respect to any discrimination or any attempt to create an intolerable work environment for the Plaintiff, nor was a sufficiently intolerable work place ever created.

# III.    DISCUSSION

## A.    Legal Standard On a Motion to Dismiss Pursuant to Rule 12(b)(6)

Bell Atl. Corp. V. Twombly and Ashcroft v. Iqbal have both set a well-established standard to which all courts have properly adhered to when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   Specifically, a court should dismiss a complaint only when it lacks sufficient factual allegations so as to state a claim for relief that is "plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 L. Ed. 2d (2007).  Further, the Second Circuit in particular has defined what a "plausible" claim is using "two working principles" set forth in Iqbal as guides.  Harris v. Mills, 527 F. 3d 66, 71 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 L. Ed. 2d (2009)).  "First, although 'a court must accept as true all of the allegations contained in a compliant,' that 'tenet' 'is inapplicable to legal conclusions,' and 'threadbare recitals of the element of a cause of action, supported by mere conclusory statements, do not suffice.'''  Id.  (quoting Iqbal, 556 U.S. at 678).  "Second, only a complaint that states a plausible claim for relief can survive a motion to dismiss and 'determining whether a complain states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experiences and common sense.'''  Id. (quoting Iqbal, 556 U.S. at 679).

Where a complaint is comprised of "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id.  Essentially, this Court, in considering the Defendants' motion to dismiss, must take the Plaintiffs' assertions of all factual allegations as true and draw any reasonable inference in the Plaintiffs' favor.  See Zinermon v. Burch, 494 U.S. 113,

118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990) (noting that on "a motion to dismiss, [the Court] must take the facts alleged in the complaint as true, drawing all reasonable inferences in the Plaintiff's favor").

However, merely reciting the elements that need to be established in order to make out the Plaintiffs' case, or assertions of conclusions without sufficient factual background to make such conclusory statements plausible will not, on their own, be sufficient to satisfy the requirements of a "well-pleaded" complaint. Thus, if the Court finds that the Amended Complaint has not stated any set of facts that would entitle the Plaintiff to relief and such facts do not raise a plausible inference that such relief may be granted, the Court may grant dismissal pursuant to Fed. R. Civ. P. 12 (b)(6). Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993); see also Marisco v. NCO Fin. Sys., No. 12-CV-06220, 2013 U.S. Dist. LEXIS 74213, at *1, *4-5 (E.D.N.Y. May 23, 2013).

This is not to say that a heightened pleading requirement is imposed in cases such as this discrimination case. Rather, the Second Circuit has noted that heightened fact pleading of specifics are not required. The only requirement is that there be "enough facts to state a claim to relief that is plausible on its face." Arista Records LLC v. Doe, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Bell Atl. Corp., v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). In addition, the predominant issue to be decided in a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

While the Second Circuit has yet to clarify the precise pleading standard with regard to discrimination cases, the United States Supreme Court has noted that "the *prima facie* case set forth under <u>McDonnell Douglas Corp., v. Green,</u> 411 U.S. 792 93 S. Ct. 1817, 36 L. Ed 2d 668 (1973) as to the elements, order, and allocations of proof is an evidentiary standard, not a pleading requirement." <u>Swierkiewicz v. Sorema N.A.,</u> 534 U.S. 506, 510, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002) (observing that the Second Circuit "has never indicated that the requirements for establishing a *Prima facie* case under <u>McDonnell Douglass</u> also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss").

While the standard set forth in <u>Twombly</u> seems to have been extended to all civil cases through the Supreme Court's holding in <u>Iqbal</u>, the Second Circuit has reiterated that the <u>Swierkiewicz</u> standard continues to exist within the <u>Iqbal</u>-<u>Twombly</u> framework and is the standard to be used in analyzing whether or not a plausible claim for discrimination has been stated. <u>Hemans v. Long Island Jewish Med. Ctr.,</u> No. 10 Civ. 1158, 2010 WL 4386692, at *1, 6 (E.D.N.Y. Oct. 28, 2010); <u>see also</u> <u>Gillman v. Inner City Broad Corp.,</u> No. 08 Vic. 8909, 2009 WL 3003211, at *1, 3 (S.D.N.Y. Sept. 18, 2009) (stating that "<u>Iqbal</u> was not meant to displace <u>Siwerkiewicz</u>'s teachings about leading standards for employment discrimination claims because in <u>Twombly</u>, which heavily informed <u>Iqbal</u>, the Supreme Court explicitly affirmed the vitality of <u>Swierkiewicz</u>").

**B.**     <u>**As to the Statute of Limitations**</u>

A plaintiff must file any and all claims under Title VII with the EEOC within 300 days of the discriminatory act or practice. <u>See e.g.</u> <u>Patker v. New York City Dep't of Educ.,</u> No. 08 Civ. 7673, 2010 U.S. Dist. LEXIS 30388, at *1, *19-20 (S.D.N.Y. March

22, 2010) (dismissing with prejudice "Title VII and ADEA claims based upon discrete acts of discrimination or retaliation" on the ground that these claims were not timely filed).

The Defendants assert that the Plaintiff's newly added allegations – specifically the August 2008 statements made by Im and the Defendants' alleged actions in compelling the Plaintiff to return to work while he was undergoing back treatment – are untimely because they both occurred prior to September 20, 2008, 300 days prior to the filing of Plaintiff's EEOC and SDHR claims, which were filed on July 17, 2009. The August 2008 statement is clearly untimely as it occurred before September 20, 2008 and are thus older than 300 days. While no date is reflected in the Plaintiff's Amended Complaint with respect to the Defendants' actions in compelling him to return to work and allegedly treating him disparately in comparison to another employee, it is clear that these events took place before September 20, 2008 because the Plaintiff admits to being in the office from August 2008 to November 2008 when he was constructively discharged. Thus, if the Plaintiff was on disability leave and then forced to return, it must have occurred before September 20, 2008 and is therefore untimely.

Nonetheless, the Plaintiff seeks to circumvent the filing deadline, urging the Court to consider the "continuing violation" exception. Under this exception, the statue of limitations period is effectively tolled until the last discriminatory act takes place. See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997). In particular, the Second Circuit has held that the timely filing of an EEOC charge, which refers to "a particular discriminatory act committed in furtherance of an ongoing policy of discrimination, extends the limitations period for all claims of discriminatory acts

committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." Id. The Second Circuit has clarified that "discrete incidents of discrimination that are unrelated to an identifiable policy or practice, on the other hand, 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice.'''  Id.  (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F. 3d 708, 713 (2d Cir 1996)).  Essentially, the "continuing violation" doctrine is only applicable when there is a specific "policy or mechanism" of discrimination being committed by a defendant and "multiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."  See Hongyan Lu v. Chase Inv. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)) (emphasis in original).  "As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor."  Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000); accord Bernstein v. MONY Group, Inc., 228 F. Supp. 2d 415, 418 (S.D.N.Y. 2002).  Thus, only "compelling circumstances will warrant the application of the exception to the statute of limitations."  Quadrozzi Concrete Corp. v. City of N.Y., No. 03 Civ 5459, 1997 WL 589019 at *3 (S.D.N.Y. Sept. 19, 1997) affd, 152 F.3d 919 (2d Cir. 1998).

Here, the Plaintiff has still not sufficiently alleged a continued course of discriminatory conduct that, if proven, could constitute a policy or mechanism of race/national origin sufficient to toll the statute of limitations.  Merely alleging that he was the only Filipino in the office, and noting a series of events that appear to be unrelated, does not state a claim based on a discriminatory policy or mechanism.

However, it is true that the added allegations contained in the Amended Complaint referencing Im's remark of a negative stereotype about Filipinos and the Defendants' actions in allegedly targeting the Plaintiff and forcing him to return to work while excluding other similarly situated employees might lead to a plausible inference of discriminatory treatment. Further, coupled with the Plaintiff's former allegations, the inference of discriminatory action might be stronger than that in the Original Complaint. However, as the Defendants note, these new allegations "[amount to] nothing more than non-actionable stray remarks," and the actions taken towards the Plaintiff, without more, do not plausibly lead to the inference that such actions were based on or related to a discriminatory policy or mechanism.

The Court also finds that the Plaintiff has proffered no further allegations that he was actually treated differently from other employees that were similarly situated in all, or even some respects. The bare allegation that another employee was allowed to remain on disability leave while the Plaintiff was forced to return, with no other facts to suggest why either employee was on leave in the first place, does not create a plausible inference that the Defendants had been acting under the guise of a discriminatory policy or mechanism. Again, only in compelling circumstances will the "continuing violation" exception to toll the statute of limitation be applied, and the Court finds no such compelling circumstances here.

C.      **As to Whether the Plaintiff Has Stated a Discrimination Claim**

The Court now turns to the Plaintiff's causes of action in the amended complaint. To establish a *prima facie* case for employment discrimination, the Plaintiff must present evidence to "raise as inference of discrimination . . . [such that the Court can] presume

these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Const. Corp. v. Waters, 428 U.S. 567, 577, 98 S. Ct. 2943, 2949-50, 57 L. Ed. 2d 957 (1978). Thus, the Court will scrutinize the employers' conduct, policy, and practices to determine if the evidence proffered by the witness leads to the presumption that the acts of the Defendant, if otherwise unexplained, are more likely the result of a discriminatory motive and if so, the plaintiff has successfully met his or her burden. See id.

The Plaintiff has asserted Title VII claims against MetLife, alleging that he was discriminated against based on his protected status, specifically, his: (i) race/color, and/or (ii) national origin. The Plaintiff has also brought disparate treatment claims under Section 1981 against MetLife, and against Im in his official capacity as a MetLife employee. In response, the Defendants contend that the Plaintiff has failed to state a claim under either Title VII or Section 1981 because the Amended Complaint does not allege with requisite specificity that the Plaintiff was singled out or otherwise treated differently *because of* his race/color, or alternatively, his national origin. The Defendants characterize Plaintiff's allegations of misconduct as little more than complaints of workplace inefficiencies. Further, the Defendants contend that the newly added allegations amount to nothing more than stray, ambiguous remarks and actions that are unconnected with any discriminatory intent.

1. **As to the Title VII and Section 1981 Discrimination Claims**

Title VII prohibits discrimination based on race, color, religion, sex, or national origin "with respect to . . . compensation, terms, conditions, or privileges of employment," and discriminatory practices that would "deprive any individual of

23

employment opportunities or otherwise adversely affect his status as an employee."

Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 62 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Under Title VII, "the term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). MetLife falls squarely within the statutory definition of an employer for the purposes of a Title VII employment discrimination claim. The Second Circuit has also noted that Title VII allows liability to attach only to the employer-entity, and thus "individuals are not subject to personal liability under Title VII. Wrighten v. Glowski, 232 F.3d 119 (2d Cir. 2000); see also Copeland v. Rosen, 38 F. Supp. 2d 298, 302 (S.D.N.Y. 1999) ("individuals employees may not be held personally liable under Title VII, even if they are supervisory personnel with the power to hire and fire other employees.") Thus, Title VII claims may only be asserted against MetLife, as the Plaintiff here does.

"The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp., 411 U.S. 782, 800, holding modified by Hazen Paper Co., v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed 2d 338 (1993). Under Title VII, employers are not required to hire minority workers, but they are prohibited from acting on "discriminatory preferences for any group." Id. (seeking to achieve "trustworthy workmanship assured through fair and neutral employment and personnel decisions").

The Plaintiff has also brought claims against the Defendants under U.S.C. § 1981, urging this Court to reasonably infer "by reason of the actions and inactions of defendants

. . . [that the defendants] have engaged in unlawful discriminatory practice based upon his race/color." (Amnd. Compl., ¶ 69, 77.)  Stated another way, the Plaintiff alleges that the Defendants treated him differently from other employees because of his protected status as a racial minority and in doing so, Defendants violated his rights as guaranteed under Section 1981.

In analyzing disparate treatment claims under Section 1981, the Court applies the same standards that are used to evaluate a Title VII discrimination claim.  See e.g., Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010); see also Staff v. Pall Corp., 233 F. Supp 2d 516, 527 (S.D.N.Y. 2002) (observing that "both the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically").  Therefore, the standard set forth above and further explored below applies to both the Title VII and Section 1981 claims.

The major distinction between claims brought under Section 1981 and Title VII is that Section 1981 provides for individual liability on the part of non-employers.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (holding that individuals may be held liable under Section 1981).  While the Second Circuit has not expressly held that an individual must hold a supervisory position in order to be subject to Section 1981 liability, in Callahan v. Consolidated Edison Co. of New York, 187 F. Supp. 2d 132, 137 (S.D.N.Y. 2002), the court observed that "in each of the cases that have allowed individual liability, the individuals have been supervisors who were personally involved in the discriminatory conduct."  Hicks v. IBM, 44 F.Supp.2d 593, 597 (S.D.N.Y. 1999); see also Ayton v. Lenox Hill Hosp., No. 93 Vic. 6601, 1997 WL

10000, at *1, 8 (S.D.N.Y. Jan. 10, 1997): <u>Amin v. Quad/Graphics, Inc.</u>, 929 F. Supp 73, 78 (N.D.N.Y 1996).

In order to state a *prima facie* case for discrimination under Title VII or Section 1981, a plaintiff must establish three critical elements.  The plaintiff must; (i) maintain a protected status; (ii) have suffered an adverse employment action; and (iii) the adverse action must have "occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class."  <u>See</u> <u>e.g.</u>  <u>La Grande v. DeCrescente Distributing Co., Inc.</u>, 370 Fed. Appx. 206, 211 (2d Cir. 2010).  However, "[at] the pleading stage, a plaintiff need not establish a *prima facie* case satisfying the required elements of disparate treatment, but only [plead] sufficient facts to give the defendant fair notice of what the . . . claims are and the grounds upon which it rests."  <u>Id.</u> (quoting <u>Boykin v. KeyCorp</u>, 521 F.3d 201, 214 (2d Cir. 2008).

While a plaintiff need not elicit each and every element in the complaint, a plaintiff must provide "specific factual allegations as to events leading up to an adverse actions." <u>Morales v. Long Island Rail Road Co.</u>, No. 09 Civ. 8714, 2010 WL 1948606, at *1, 3 (S.D.N.Y. May 14, 2010).  As the Second Circuit has stated, "wholly conclusory [allegations] are not sufficient to defeat Fed. R. Civ. P. 12(b)(6) motion to dismiss." <u>Kern v. City of Rochester</u>, 93 F.3d 38, 44(2d Cir. 1996) (citing <u>Butler v. Castro</u>, 896 F.2d 698, 700 (2d Cir. 1990); <u>see also</u> <u>Rivera-Powell v. New York City Bd. Of Elections</u>, 470 F.3d 458, 470 (2d Cir. 2006) (finding the "complaint proffered only conclusory allegations of discrimination, which, without evidentiary support or allegations of particularized incidents, [did] not state a valid claim and so cannot withstand a motion to dismiss.") (internal citations and quotations omitted); <u>Lopez v. Bay Shore Union Free Sch. Dist.</u>,

668 F. Supp 2d 406, 414 (E.D.N.Y. 2009) (holding that "this Circuit continues to require that racial animus be plead with particularity.").

Thus, while the Court in <u>Swierkiewicz</u> undoubtedly eased the burden on a plaintiff pleading a claim of employment discrimination, it did not "relieve a plaintiff of the obligation to identify in his pleading a specific employment practice that is the cause of disparate impact." <u>Malone v. New York Pressman's Union No. 2</u>, No. 7 Civ. 9583, 2011 WL 2150551, at *1, *6 (S.D.N.Y. May 31, 2011) (quoting <u>Kulkarni v. City Univ. of New York</u>, No. 01 Civ 10628, 2002 WL 1315596, at *1, *2 (S.D.N.Y. Jun. 14, 2002) (dismissing plaintiff's Title VII disparate impact claim because the complaint failed to "sufficiently identify a specific discriminatory employment practice"). Rather, in order to survive a motion to dismiss, "[a] plaintiff must allege [at a minimum] those facts necessary to a finding of liability . . . [and] a plaintiff's allegations, accepted as true, must be sufficient to establish liability." <u>Id.</u> (quoting <u>Armon v. Morgan Stanley Inv. Advisors, Inc.</u>, 464 F.3d 338, 343-44 (2d Cir. 2006)). The Court thus proceeds to assess whether the Plaintiff has succeeded in stating his claims under this standard.

### a. The Plaintiff's Protected Status

Pursuant to the Title VII claim, the Plaintiff's protected status is his race/color and/or his national origin, whereas the Section 1981 claim is limited to the Plaintiff's race. Since the Defendants do not contest the fact that Plaintiff is a member of a protected class, the Court need not inquire any further and thus the Plaintiff has adequately plead membership in a protected class.

**b. The Defendants' Alleged Adverse Employment Actions**

With respect to the second prong – the alleged adverse employment actions – it is important to note that "[t]he term 'adverse employment action' is not defined in Title VII." Islamic Soc'y of Fire Dept. Pers. V. City of New York, 205 F. Supp. 2d 75, 82-83 (E.D.N.Y. 2002). Therefore, "the question of what constitutes an adverse employment action has received significant attention from the federal courts, which have not reached a consensus on the issue." Id. See Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000) (noting that the court considered different approaches in its analysis). Some courts, such as the Fifth and Eighth Circuits, "have held that an adverse employment action relates only to ultimate employment actions, such as hiring, firing, promotions and demotions." Islamic Soc'y, 205 F. Supp. 2d at 82-83; see Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997); Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997). On the other hand, other circuits such as "the First, Ninth, Tenth, Eleventh and D.C. Circuits, [have taken] an 'expansive view' of what may be considered an adverse employment action." Islamic Soc'y, 205 F. Supp. 2d at 82-83.

The Second Circuit has taken a "middle-of-the-road" approach and construes adverse employment action as circumstances that cause a "materially adverse change in the *terms and conditions* of employment." Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997) (emphasis added); see also Islamic Soc'y, 205 F. Supp. 2d at 83; McKenney v. New York City Off-Track Betting Corp., 903 F. Supp. 619, 623 (S.D.N.Y. 1995) (noting that district courts in New York State have expressly followed this rule). Thus, while a "materially adverse change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities,'" (Galabya v. New York City Bd.

Of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)), what ultimately constitutes an adverse employment action is assessed on a case-by-case basis.  See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).  The Second Circuit has also recognized that factors including, but not limited to, "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation" should be considered when determining what might constitute a materially adverse change.  Galabya, 202 F.3d at 640 (quoting Crady, 993 F.2d at 136).

Here, the Plaintiff alleges that MetLife subjected him to disparate treatment, including depriving him of computer access; denying a bonus; falsely accusing him of substandard work performance; and failing to present him with the company's "Compensation Plan Acknowledgement" at the beginning of his employment when it was presented to other employees.  In addition, the Plaintiff contends that he was actually or constructively discharged from his employment without legitimate cause and on the basis of his race/color and/or national origin.  The Defendants neither explain nor deny that the Plaintiff was denied computer access and was not offered a bonus.  Also, the Defendants do not refute that the compensation plan should have been given to the Plaintiff at the beginning of his employment.  However, the Defendants dispute that the Plaintiff was actually or constructively discharged.  Likewise, the Defendants contend that no false accusations were made against the Plaintiff, but rather, his work performance fell below the expectations which all MetLife employees were held to.

In the Court's view, the Plaintiff's inability to access or use the MetLife computer system for a given period of time would have the indicia of an adverse employment action. See Gelin v. Geithner, No. 06 Civ. 10176, 2009 WL 804144, at *14 (S.D.N.Y. March 26, 2009) ("The disruption to Plaintiff's remote access from October through November 2005 also arguably qualifies as an adverse employment action, as it continued after Plaintiff's suspension had ended, thereby interfering with Plaintiff's ability to access the IRS computer system while at home or working in the field."); see also Terry v. Ashcroft, 336 F.3d 138, 145 (2d Cir. 2003) (holding that suspension of use of a government-owned vehicle was materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work."). Thus, MetLife's action in depriving the Plaintiff of access to the computer system, which appears to have been needed to fully engage in his position, could easily fall into the category of "adverse employment action."

On the other hand, the Court finds that the allegation that the Defendants deprived the Plaintiff of a bonus does not amount to an adverse employment action. In Malone, it was established that "[t]he elimination of speculative, potential future opportunities is insufficient to establish an adverse employment action." 2011 WL 2150551, at *7.

Finally, the Plaintiff's discharge from employment – whether actual or constructive – would of course be considered an adverse employment action. See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996) (noting "one of the elements of a *prima facie* case of discriminatory discharge, as one might expect, is that the employee was discharged . . . This element may be satisfied by a showering of an actual or constructive discharge.") Thus, the Complaint has adequately pled several

instances of potential adverse employment actions and it is inconsequential to consider whether or not the Plaintiff's other allegations, had they been timely, would also constitute adverse employment actions.

### c. Casual Relations Between the Protected Status and Adverse Actions

Because the Plaintiff can satisfy the first two elements for stating a Title VII or Section 1981 discrimination cause of action, the Court's focus in the present motion concerns the casual relationship between the Plaintiffs' protected status and the alleged adverse employment actions. As set forth above, there are differing views as to the precise degree of particularity that a plaintiff must plead the employment discrimination in order to survive a motion to dismiss. In <u>Phillip v. University of Rochester</u>, 316 F.3d 291, 298 (2d Cir. 2003), the Second Circuit concluded that while the complaint "did not contain many evidentiary allegations relevant to intent, it [did] allege that the plaintiffs were singled out of a group that apparently contained non-minority students," and was thus adequate to state a cause of action. <u>Id.</u>

Likewise, where a plaintiff simply alleged his protected status, "identified the adverse employment action underlying his claim, *i.e.*, his termination, and stated that he was treated differently from other white and/or Hispanic employees due to his race," a court found these general allegations enough to state a plausible claim upon which relief could be granted. <u>Smalls v. PetSmart, Inc.</u>, No. 09 Civ. 5347, 2010 WL 5572073, at *1, *4 (E.D.N.Y. Nov. 1, 2010), <u>report and recommendation adopted by</u> <u>Smalls v. Petsmart, Inc.</u>, No. 09 Civ. 5347, 2011 WL 96576, at *1 (E.D.N.Y. Jan. 10, 2011).

In <u>Smalls</u>, the plaintiff did not specifically allege that he was treated differently than "other employees [who] were 'similarly situated.'" <u>Id</u>. Nevertheless, because the

complaint "identified those employees and thus provided [the defendant] with adequate notice of his claim, the court ruled in plaintiff's favor, denying the motion to dismiss. Id.; see also Peterson v. long Island R.R. Co., No. 10 Civ 480, 2010 WL 2671717, at *1, 4 (E.D.N.Y. June 30, 2010) (recognizing that the court held dismissal was not required despite the fact that plaintiff did not plead any allegations related to "comparators"). Applying a more stringent interpretation of the pleading standard set forth in Twombly, in Malone, a district court granted a motion to dismiss where the complaint "summarily lable[ed] actions [as] . . . discriminatory [but] fail[ed] to connect the alleged discrimination] to any concrete adverse employment action." Malone 2011 WL 2150551 at *7.

In Peterson, the court noted that the plaintiff did not specifically plead "comparators." 2020 WL 2671717, at *4. However, there were allegations that the plaintiff's employer had: (1) referred to the plaintiff as "you people", and (2) subjected "white employees" (generally speaking, not individually identified) "to less severe punishment [than the plaintiff] for substantially similar conduct." Id. This allowed the court to make a comparison from which it could infer that the disparate treatment was based on the plaintiff's protected status.

In the present case, the Plaintiffs disparate treatment claims are not nearly as definitive as the above mentioned cases and, in the Court's view, do not give rise to a plausible cause of action. The fact that the Plaintiff was the only Filipino in his office is not sufficient to connect the Defendants' actions and behavior to a discriminatory intent. Even if the Court assumed that the Plaintiff's added allegations were sufficient to toll the statute of limitations, only his allegations that Im stated that "Filipinos were heavy beer

drinkers" and that he was required to return from disability leave while another Caucasian employee was allowed to remain on disability leave, undisturbed for three years, would be relevant here.  However, merely acknowledging a stereotype which may have negative connotations, combined with the alleged facts that the Plaintiff was the only Filipino in the office and had experienced different forms of treatment than his coworkers, still does not make the Plaintiff's claim sufficiently plausible.  Without any further facts, Im's statements, while politically incorrect, do not raise a plausible inference that his actions towards the Plaintiff were a result of the plaintiff's membership in a protected class.  Further, such a comment, being so far removed in time and with such a tangential relationship to the Plaintiff's ultimate discharge, can be characterized as a "stray remark" which does not constitute sufficient evidence to state a case for employment discrimination.  <u>Danzer v. Norden Sys.</u>, 151 F.3d 50, 56 (2d Cir. 1998).  <u>See also</u> <u>Jowers v. Family Dollar Stores, Inc.,</u> No. 09 Civ. 2620, 2010 LEXIS 91581, at *2, *9–10 (S.D.N.Y. Aug 16, 2010) <u>affd</u>, 455 Fed. Appx. 100 (2d Cir. 2012) (noting that the single statement that "black people are lazy and incompetent" one month prior to the plaintiff's termination was a stray remark insufficient to establish an inference of discrimination on its own).

Similarly, the Court finds that without any further facts as to the other employee who was out on disability leave, no proper comparison can be made from which to draw a plausible inference that such disparate treatment was based on the Plaintiff's membership in a protected class.  It may be that the other employee out on leave could have suffered a much more severe injury and was not actually similarly situated with respect to the Plaintiff.  Further, without additional background facts to shed light on the

racial composition of the other employees in the office and why they were not treated like the Plaintiff, this Court cannot plausibly infer that the Plaintiff was targeted because of his race/color and/or nation origin.  Thus, while the Plaintiff may have proffered a "comparator," there are not enough facts to support the contention that these employees were so similarly situated to the Plaintiff that treating the Plaintiff differently from the other employees was sufficient to raise a plausible inference of disparate treatment based on racial animus.

The Plaintiff continues to contend that a Title VII plaintiff need not set forth circumstances supporting an inference of discrimination in order to survive a Rule 12(b)(6) motion, and that their newly alleged facts are sufficient enough to put the Defendant on proper notice and thus satisfy the proper pleading standard (See Phillip 316 F.3d at 298).  However, in the Court's view, the newly alleged facts do not raise at least a facially plausible inference that the Defendants actions were motivated by racial animus. Consequently, the Plaintiff's discrimination claims under Title VII against Defendant MetLife, as well as under Section 1981 against all named Defendants, are hereby dismissed.

**D.       Whether the Plaintiff Has Stated a Claim for Hostile Work Environment**

While the Plaintiff's employment discrimination claims under a disparate treatment theory are not sufficient to withstand a motion to dismiss, the Court must also consider the Plaintiff's Title VII and Section 1981 claims pursuant to a hostile work environment theory.

The Plaintiff contends that "[t]he acts discussed in the complaint, together with [his] assertions that the actions were improperly motivated, [is] sufficient to withstand"

the motion to dismiss presently before the Court. (Pl.'s Motion in Opp. at 12.)  In opposition, the Defendants contend that these general allegations fail to satisfy the "severe or pervasive" standard, which is used to assess a hostile work environment claim. (Defs.' Motion at 19.)  Also, the Defendants maintain that even if the Plaintiff has shown the creation or existence of a hostile work environment, the Plaintiff has plead no facts – expressly or impliedly – that the alleged "hostility" resulted from Plaintiff's protected status. (Id.)

**1. Presence of a Hostile Work Environment**

The standard used to demonstrate a hostile work environment is essentially the same for all claims brought under Title VII and Section 1981. Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2, 798 F. Supp 2d 443, 451-52 (E.D.N.Y. 2011); see Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006); Patterson v. Cnty of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). Generally, to succeed on a hostile work environment claim, a plaintiff must demonstrate that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive [enough] to alter the conditions of the victim's employment.'"  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)).  Furthermore, the Second Circuit has determined that "[p]roving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that

environment to be abusive." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (quoting Harris, 510 U.S. at 23, 114 S. Ct. 367).

"Notably, the Second Circuit has directed that in deciding whether the plaintiff suffered an atmosphere of hostility, courts must look to the totality of all the circumstances." Anderson v. Nassau County Dept. of Corr., 558 F. Supp. 2d 283, 294 (E.D.N.Y. 2008) (citing Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001). Moreover, "[w]hereas other disparate treatment claims may [require the court to] scrutinize discrete harms such as hiring or discharge," a claim which is premised upon a hostile work environment theory also compels an assessment of other factors that might affect the "workplace environment as a whole [so as] to discover whether it is abusive." Raniola, 243 F.3d at 617. The court considers a number of factors, none of which is determinative. See Harris, 510 U.S. at 23, 114 S. Ct. 367; E.E.O.C. v. Int'l Profit Associates Inc., 654 F. Supp. 2d 767, 783 (N.D. Ill. 2009) (explaining that "[w]hether this standard is met turns on a 'constellation of factors'") (quoting Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806 (7th Cir. 2000)).

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The unlawful employment practices therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not [although it can] be actionable on its own. Such claims are based on the cumulative effect of individual acts.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L.E.2d 106 (2002) (citations omitted).

The factors considered by the court "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989). Nevertheless, it has been held that "if the alleged conduct is 'extraordinarily severe,' a single incident . . . may create a hostile environment." Wahlstrom v. Metro-N. Commuter R. Co., 202 F.3d 560, 570 (2d Cir. 2000)).

Here, the Plaintiff alleges that given his newly added allegations, the Defendants' conduct sufficiently and substantially interfered with his work performance and disturbed his psychological well-being. The Plaintiff alleges that on more than on occasion, he perceived the Defendants' actions as disrespectful, and thus offensive. The Plaintiff also asserts that the Defendants embarrassed him in front of his peers, causing damage to his reputation. The Plaintiff also contends that that Im made false accusations him, which prompted him to be placed on the "Action Plan." Similarly, the Plaintiff also contends that Im made comments that were politically incorrect which were also couched in racial animus. Further, the Plaintiff alleges that he was forced to return to work when he should have been on disability leave while another employee remained on leave undisturbed.

Even if the Plaintiff's added allegations tolled the statute of limitations and effectively allowed the Plaintiff to combine these allegations with those addressed in the Court's original Memorandum of Decision and Order, the Plaintiff still fails to sufficiently allege a hostile work environment.

The Plaintiff's additional allegations in his Amended Complaint that Defendant Im made a politically incorrect statement and that the Plaintiff was forced to return to work while he was out on disability leave while another employee was allowed to remain out on disability leave, without more factual specificity, are not sufficient to constitute a

hostile work environment. The Court finds that Im's statements also appear to be nothing more than a stray remark or a passing question, and while it may have been politically incorrect, such a statement does not objectively constitute the ridicule or insult that is sufficiently severe to create a hostile work environment. Further, "mere utterances . . . of an epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII." Harris 510 U.S. at 21, 114 S. Ct. 367. The Court finds that there are not enough facts to support a plausible inference that the complained of conduct was severe or pervasive enough to create an objectively hostile or abusive work environment in an objective person. As the Court already addressed, the allegations in the Plaintiff's original complaint were insufficient and these added allegations do not sufficiently alter the character of the hostile work environment claim.

The Plaintiff has also alleged, identically to his original complaint, that the Defendants, in two particular incidents, were cantankerous and threatening in their actions towards him. The Plaintiff alleges that the Defendants actions contributed to creating a hostile work environment. Specifically, the Plaintiff points to the instance in which Im showed up three hours late to a meeting, forcing the Plaintiff to wait for him, and another instance in which Im falsely accused the Plaintiff of being late, then hit him on the back, which pushed him slightly forward into his desk.

This Court has already addressed the two separate allegations on their own as detailed above and found them not to be of sufficient character to properly form the basis of a hostile work environment claim. The Court rejected the Plaintiff's claim reasoning that having to wait three hours could hardly create a hostile work environment and that a

minor, singular incident of physical conduct was similarly unlikely to raise a plausible inference that a hostile work environment existed in this case. See Meriwether v. Caraustar Packaging Co., 326 F.3d 990 (8th Cir. 2003) (finding a single incident of co-worker's squeezing of employee's buttocks, and subsequent "joke about such conduct, did not rise to the level of severe or pervasive conduct); Divers v. Metropolitan Jewish Health System, No. 06 Civ. 6704, 2009 WL 103703, at *16 (E.D.N.Y. Jan 14, 2009), (noting that the plaintiff's allegations of physical contact was not sufficient to support a hostile work environment claim because "it was an isolated occurrence insufficient to trigger § 1981); Ricks v. Conde Nast Publications, Inc., 92 F. Supp. 2d 338, 348 (S.D.N.Y. 2000) (holding that an allegation that a defendant hit the plaintiff on the shoulder and pushed her out of her office was insufficiently severe to establish a hostile work environment claim); Cf. Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001) ("We have no doubt a single incident of rape" can satisfy the requirement that the harassment be sufficiently severe or pervasive conduct), cert. denied, 537 U.S. 824 (2002); Al – Dabbagh v. Greenpeace, Inc., 873 F. Supp. 1105, 1108, 1111 (N.D. Ill 1994) (determining that a single incident was sufficiently severe where the perpetrator co-employee "slapped [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, chocked her with a phone cord and ultimately forced her to have sex with him").

Similarly, the Court finds that the Plaintiff's added allegations do not elevate the status of the Plaintiff's work environment to one that was hostile. Im's statement, which was more of a politically incorrect question, hardly created a hostile work environment and, without more, could not plausibly do so from an objective standpoint. Further, asking the Plaintiff to return to work from disability leave has little to do with respect to

creating a hostile work environment. Thus, the Plaintiff is compelled to rely on alleged facts of a single incident of physical contact and other issues that, at best, tenuously support a hostile work environment claim. See Aina v. City of New York, No. 05 Civ. 7533, 2007 WL 401391, *1, 6 (S.D.N.Y. Feb. 6, 2007) (dismissing a hostile work environment claim after the court concluded that the "isolated and ultimately inconsequential incident – in the absence of even a single additional occurrence of alleged physical aggression" did not support a sustainable cause of action. The physical contact alleged in Aina was a supervisor "slam[ing] the door in such a violent manner that it almost hit [plaintiff's] knee.")

As one district court noted, "[c]ourts rarely find limited incidents of physical violence without a sexual element to establish a hostile work environment." Gerald v. Locksley, 849 F. Supp. 2d 1190, 1234 (D. N.M. 2011). Thus, for a single non-sexual incident to establish a hostile work environment claim, it must be extremely severe. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (noting isolated comments or incidents, unless extremely serious, are not actionable under Title VII).

In this case, the Plaintiff merely complains of being physically contacted on the shoulder and pushed forward into a desk. There are no further allegations that he incurred any injury or sought further medical attention. As the Court previously noted, while the encounter between the Plaintiff and Defendant Im was highly offensive, a single occasion of harassment is insufficient to establish a hostile work environment claim, and the additional facts alleged in the Plaintiff's Amended Complaint are not sufficient to alter this Court's initial decision.

**2. Connection Between the Alleged Hostility and Protected Status**

Even if the Plaintiff did sufficiently allege the existence of a hostile work environment, he would still need to allege a connection between the hostility and his protected status in order to sufficiently state a hostile work environment claim under Title VII or Section 1981. Although it has been held that "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination occurred," (Svenningson v. Coll. Of Staten Island, No. 01 Civ. 7750, 2003 WL 21143076, at *1, *2 (E.D.N.Y. Mar. 23 2003)), a plaintiff must still establish that the circumstances in which "the incidents [occurred] can reasonably be interpreted as having taken place on the basis of that trait or condition.'" Divers, 2009 WL 103703, at *15; cf, Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (noting that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent").

As discussed above, because the Plaintiff's new allegations are untimely, and will most likely not be found sufficient to constitute a "continuing violation," they should not be considered. Thus, the Plaintiff is left with a single allegation which is identical to his original complaint, and which the Court has already noted, was insufficient to establish that the Defendant's actions demonstrated any animus based upon the Plaintiff's protected status. The Plaintiff's sole allegation of being the only Filipino in the office, the Court observed, hardly created a plausible inference that he was targeted for that reason. (Mem. of Decision and Order, at 39.) However, if the Plaintiff's additional

allegations suffice to toll the statute of limitations, this becomes a closer question. Im's statement regarding Filipino's as heavy beer drinkers may have been offensive to the Plaintiff, but taken alone, it hardly creates a plausible inference that Im himself targeted the Plaintiff because of his race. Similarly, without any further factual allegations, the Plaintiff's allegations that he was forced to return to work from disability leave while another Caucasian worker was allowed to remain on such leave for three years uninterrupted does not create a plausible inference that the Defendant's actions were premised on the Plaintiff's protected status. Without more knowledge about how similarly situated these respective employees were, no such inference can plausibly be drawn here.

However, prior cases have noted that where such connections between discriminatory motive and the hostile work environment seem tenuous or nonexistent initially, a district court may use its discretion to allow the case to continue and let the Plaintiff build his case. See Alfano, 294 F.3d, at 377. Here, in the Court's view, the Plaintiff's contention appears tenuous at best, but an element of race is introduced and this Court could use its discretion to let this claim go forward. However, given the lack of a hostile work environment in the first place and the tenuous nature of the Plaintiff's claim, a claim of discriminatory employment practices based on a hostile work environment theory will also fail.

In sum, the Court finds that the Plaintiff has failed to plead that a hostile work environment was created and existed because of his protected status, either race, color, or national origin. The Plaintiff has also not adequately plead a casual connection between his protected status and the alleged hostile work environment. The Court also agrees

with the Defendants' contentions that the Plaintiff's new allegations contained in the Amended Complaint are untimely and even if they were not, they do not raise a plausible inference of discrimination based on the Plaintiff's protected characteristics, nor do they establish that any adverse action was taken based on such characteristics. Accordingly the Court dismisses the hostile work environment claims.

**E.  As to the Plaintiff's Constructive Discharge Claim**

Finally, the Plaintiff asserts that the cessation of his employment was not voluntary, but rather, that the Defendants engaged in a course of conduct which could be construed as constituting a constructive discharge. The Defendants counter that the Plaintiff left work without making any complaint or providing any explanation of his conduct; refused to return to his position of employment despite the Defendants' requesting that he do so; and consequently abandoned his employment.

For the Court to find a constructive discharge, a plaintiff must show that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151 – 52 (2d Cir. 2003) (holding that allegations of constructive discharge, "viewed as a whole, [must be] so difficult or unpleasant that a reasonable persons in the employee's shoes would have felt compelled to resign"). Further, "[w]hether working conditions are sufficiently intolerable to constitute a constructive discharge 'is assessed objectively by reference to a reasonable person in the employee's position.'" Borski v. Staten Island Rapid Transit, 413 Fed. Appx. 409, 411 (2d Cir. 2011) (quoting Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004)).

The standard for constructive discharge is a demanding one because it "cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant." Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993); Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001) (noting that "[t]he standard for constructive discharge is even higher" than that used to show a hostile work environment); see also Madray v. Long Island Univ., 789 F. Supp. 2d 403, 410 (E.D.N.Y. 2011) (observing that "vague, general allegations, quite incapable of inviting a meaningful EEOC response [cannot be relied upon as a] predicate [for] subsequent claims in the federal lawsuit").

Here, the Plaintiff has not included a separate count in the Amended Complaint based upon constructive discharge nor does he address it in any of his supplemental documents. To the extent that the Amended Complaint can be read to assert a claim for constructive discharge, the allegations contained therein are insufficient to state such a claim because the Plaintiff has not sufficiently pleaded an intolerable work place. See Miller v. Praxair, Inc., No. 5 Civ. 402, 2009 WL 1748026, at *6 (E. Conn. June 18, 2009) ("A constructive discharge claim must entail something more than what is required for an ordinary sexual harassment or hostile-environment claim.") Thus, the Plaintiff's constructive discharge claim should be dismissed.

## IV. CONCLUSION

For all the foregoing reasons, it is hereby

     **ORDERED**, that the Defendants' motion to dismiss the Complaint is granted in

its entirety.  The Clerk is directed to mark the case as closed.

So ORDERED
July 11, 2013

          */S/ Arthur D. Spatt*
          **ARTHUR D. SPATT**
          **United States District Court Judge**